**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3820
_____

UNITED STATES OF AMERICA

v.

COREY GRANT,
               Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2:90-cr-00328-009)
District Judge: The Honorable Jose L. Linares
_____

Argued October 26, 2017 (Merits Panel)
Argued February 20, 2019 (En Banc)

Before: SMITH, *Chief Judge*, McKEE, AMBRO,
CHAGARES, JORDAN, HARDIMAN, GREENAWAY, JR.,
KRAUSE, RESTREPO, BIBAS, and PORTER, *Circuit
Judges*

(Filed August 16, 2021)

Lawrence S. Lustberg                    [ARGUED]
Avram D. Frey
GIBBONS PC
One Gateway Center
Newark, NJ 07102
        *Counsel for Appellant Corey Grant*

Marsha L. Levick                    [ARGUED]
JUVENILE LAW CENTER OF PHILADELPHIA
1800 John F. Kennedy Boulevard, Suite 1900B
Philadelphia, PA 19103
        *Counsel for Amicus Appellant Juvenile Law Center*

Jon M. Greenbaum
LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, N.W., Suite 900
Washington, D.C. 20005
        *Counsel for Amicus Appellant Lawyers Committee for*
        *Civil Rights Under Law*

Elana Bildner
AMERICAN CIVIL LIBERTIES UNION
765 Asylum Avenue, 1st Floor
Hartford, CT 06105
        *Counsel for Amicus Appellant Juvenile Sentencing*
        *Project*

Jennifer Merrigan
PHILLIPS BLACK
1901 South 9th Street, Suite 510
Philadelphia, PA 19148
        *Counsel for Amicus Appellants Alison Flaum, Shobha*
        *L. Mahadev, and Jenny Carroll*

Bruce P. Keller                          [ARGUED]
Mark E. Coyne
OFFICE OF THE UNITED STATES ATTORNEY
970 Broad Street, Room 700
Newark, NJ 07102
        *Counsel for Appellee United States of America*

————————————

## OPINION OF THE COURT

————————————

SMITH, *Chief Judge*, with whom CHAGARES, JORDAN, HARDIMAN, KRAUSE, BIBAS, and PORTER, *Circuit Judges*, join. McKEE and AMBRO, *Circuit Judges*, join except with respect to Section III.B. GREENAWAY, JR., *Circuit Judge*, joins except with respect to Section III.A.

A federal court jury convicted Corey Grant in 1992 of homicide and other crimes that he had committed while he was a juvenile. The presiding judge sentenced Grant to life imprisonment under the then-mandatory U.S. Sentencing Guidelines. Parole is unavailable to those convicted of federal crimes,[1] so the sentence effectively condemned Grant to die in prison—with proof of circumstances warranting compassionate release his only hope.

---

[1] The Sentencing Reform Act of 1984, Pub. L. No. 98-473, §218(a)(5), 98 Stat. 1987, 2027 (repealing 18 U.S.C. §§4201–18), abolished parole for federal inmates.

3

In 2012, the Supreme Court of the United States decided *Miller v. Alabama*, 567 U.S. 460, which held that the Eighth Amendment permits a life-without-parole ("LWOP") sentence for a juvenile homicide offender only if the sentencer could have imposed a lesser punishment based on the offender's youth at the time of the offense. Later, the Court made *Miller* retroactive to cases on collateral review. *Montgomery v. Louisiana*, 577 U.S. 190 (2016). Because Grant's LWOP sentence was imposed mandatorily, *Miller* entitled him to a new sentencing.

At resentencing, the District Judge noted Grant's minority at the time of his crimes and recognized that youth can impair judgment and thereby mitigate culpability. The Judge stated that a life sentence for Grant would be too harsh, given his juvenile offender status and individual circumstances, and instead sentenced Grant to a term of 60 years on his homicide-related convictions. Factoring in an undisturbed five-year consecutive sentence, Grant's total sentence was effectively reduced to 65 years.

Grant now argues that his 65-year sentence violates *Miller* because it incarcerates him to his life expectancy, thereby amounting to a de facto LWOP sentence. Grant contends that *Miller* forbids such a sentence for a juvenile homicide offender unless he or she is incorrigible, which Grant is not. But *Miller* only entitled Grant to a sentencing hearing at which the District Court had discretion to impose a sentence less than LWOP in view of Grant's youth at the time of his

4

offenses. And that is what he received. So we will affirm Grant's 65-year sentence.[2]

In the alternative, Grant maintains that we should remand for yet another sentencing proceeding because vacatur of his LWOP sentence under *Miller* invalidated his lesser-included concurrent sentence on drug-trafficking counts. But Grant did not preserve this argument, and the District Court's failure to extend our sentencing-package doctrine beyond vacated *convictions* to vacated *sentences* was not plain error.

## I. BACKGROUND

In March 1987, law enforcement officials in Elizabeth, New Jersey learned of gang activities emanating from a group known as the E-Port Posse. Led by an individual named Bilal Pretlow, the Posse operated a narcotics network that regularly bought multi-kilogram quantities of cocaine in New York City, cut and packaged the cocaine in stash houses, and sold it on the streets of Elizabeth. The Posse's members carried firearms, regularly assaulting and murdering to carry out its objectives.

Recruited by Pretlow, Grant joined the Posse in 1986 when he was 13 years old and went on to serve as one of its lead enforcers. At 15, Grant was twice apprehended by law enforcement in drug raids. As a juvenile, he also committed other offenses. After being detained on drug charges, he was released in April 1989 on 18 months' probation.

---

[2] We will vacate and remand Grant's sentence only on one drug-trafficking count so that the District Court may correct a mistaken enhancement of his concurrent sentence on that count.

Sixteen-year-old Grant was involved in the Posse's violent crimes, notably, its murders and attempted murders in the summer of 1989. In August, while delivering drugs, Grant encountered a group of rival drug dealers. Among them was a former Posse member, Dion Lee, suspected of selling drugs on his own. Grant warned him at gunpoint not to operate in Pretlow's territory unless he was working for Pretlow. When Lee refused, Grant struck him in the head with a gun while another member of the Posse assaulted him. Although Lee retreated, Grant and an associate shot at him. Lee survived, though a bullet pierced one of his pantlegs. Later that month, Grant encountered Lee's brother Mario—another independent drug dealer whom the Posse had warned not to operate in its territory. Grant tried to force Mario into a building, but Mario broke free and attempted to flee. Grant then ordered a Posse member to shoot the retreating Mario. Grant's associate fired two shots, one of which struck Mario in the neck and killed him.

In 1991, at the age of 17, Grant was indicted for conspiracy under the Racketeer Influenced and Corrupt Organizations Act (RICO), in violation of 18 U.S.C. §1962(d) (Count I); racketeering, in violation of 18 U.S.C. §1962(c), including the murder of Mario Lee and two others as well as the attempted murder of Dion Lee and another person, as defined in N.J. Stat. Ann. §2C:11-3 (Count II); conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. §846 (Count IV); possession with intent to distribute cocaine, in violation of 21 U.S.C. §§841(a)(1) and (b)(1)(B) (Counts V and VI); and two counts of possession of a weapon in relation to a crime of violence or drug trafficking, in violation of 18 U.S.C. §924(c) (Counts X and XI).

6

In February 1992, Grant proceeded to trial as an adult under 18 U.S.C. §5032.  The jury found him guilty of the RICO conspiracy, racketeering, and drug counts as well as one of the gun possession counts.[3]  As predicates for the RICO convictions, the jury found that Grant murdered Mario Lee and attempted to murder Dion Lee.  The jury acquitted Grant of one of the charged RICO-predicate murders but could not reach a verdict on whether Grant committed the other murder or the other attempted murder.

Given Grant's homicide conviction, the Probation Office calculated his sentence under the then-mandatory U.S. Sentencing Guidelines as life imprisonment.  At Grant's original sentencing, the District Court denied Grant's downward-departure motion and imposed the mandatory life sentence on the RICO and racketeering convictions (Counts I and II), a 40-year concurrent term of imprisonment on each of the drug-trafficking counts (Counts IV–VI), and a mandatory consecutive five-year sentence on the gun-possession conviction (Count XI).  We affirmed Grant's convictions and sentence on direct appeal.  *United States v. Grant*, 6 F.3d 780 (3d Cir. 1993) (unpublished table decision).

Twelve years later, Grant petitioned for a writ of habeas corpus under 28 U.S.C. §2241.  The District Court dismissed the petition for lack of jurisdiction, and we affirmed.  *Grant v. Williamson*, 198 F. App'x 263 (3d Cir. 2006) (per curiam).  Grant then filed a §2255 motion, which was denied as untimely.  *See Grant v. United States*, No. 2:06-cv-5952, slip op. at 4–7 (D.N.J. Feb. 8, 2008).

---

[3] The other gun-possession charge was dismissed as against Grant before the return of a verdict.

7

Then, in 2012, the Supreme Court decided *Miller v. Alabama*, which held that the Cruel and Unusual Punishments Clause of the Eighth Amendment prohibits mandatory life-without-parole sentences for juvenile homicide offenders. 567 U.S. at 479, 489. Under *Miller*, someone under the age of 18 who commits a homicide may be sentenced to life without parole, but only if the sentence is not mandatory and the sentencer has discretion to impose a lesser punishment after considering the offender's youth and related characteristics in mitigation.

In light of *Miller*, Grant sought and received leave from this Court to file a second §2255 motion. *In re Pendleton*, 732 F.3d 280, 281–82 (3d Cir. 2013) (per curiam). He argued that his mandatory sentence of life imprisonment was imposed without consideration of mitigating circumstances related to his age at the time of his crimes. The District Court agreed and ordered that Grant be resentenced. *Grant v. United States*, No. 2:12-cv-6844, slip. op. at 10–12 (D.N.J. Nov. 12, 2014). In 2016, the Supreme Court confirmed that *Miller* applies on collateral review to juvenile homicide offenders serving final sentences. *Montgomery*, 577 U.S. at 206, 212.

At resentencing, the District Court announced that it would limit the scope of its review to Grant's RICO conspiracy and racketeering convictions—the counts underlying his mandatory life sentence. Under the now-advisory Guidelines, Grant's recommended sentence on Counts I and II remained life imprisonment. But the District Court determined that Grant's upbringing, debilitating characteristics of youth, and post-conviction record showed that he was "not that rarest [] exception referenced in *Miller*, where the lifetime without

8

parole is appropriate." A150–51.[4] So the District Court imposed a sentence of 60 years' imprisonment on Counts I and II, effectively reducing his life sentence to a total term of 65 years after factoring in his undisturbed five-year consecutive sentence on his firearms-possession conviction. (The District Court also, apparently inadvertently, increased Grant's concurrent sentence on one of his drug-trafficking convictions, Count IV, from 40 to 60 years.) Assuming he accumulates good-time credits, *see* 18 U.S.C. §3624(b)(1), Grant will be released at age 72, which he contends is his life expectancy.

Grant appealed his new 65-year sentence, arguing that it amounts to de facto LWOP imposed in violation of *Miller*. A panel of this Court agreed, holding that a term-of-years sentence that incarcerates a non-incorrigible juvenile homicide offender until the national age of retirement is a de facto LWOP sentence that presumptively violates *Miller*. *United States v. Grant*, 887 F.3d 131, 143–53 (3d Cir. 2018). The panel thus vacated Grant's sentence and remanded the case to the District Court for resentencing on his RICO conspiracy and racketeering counts as well as for correction of the mistakenly increased Count IV sentence. *Id.* at 155.

We decided to hear the case en banc and therefore vacated the panel decision. *United States v. Grant*, 905 F.3d 285 (mem.) (3d Cir. 2018). We will now affirm Grant's sentence on all counts in the judgment of conviction except for Count IV, which we will vacate with instructions that, upon remand, the District Court reinstate the original 40-year concurrent sentence.

---

[4] Citations preceded by "A" refer to Appellant Corey Grant's Appendix submitted on appeal.

9

## II.     JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 18 U.S.C. §3231, and we have jurisdiction under 28 U.S.C. §1291 and 18 U.S.C. §3742(a).

For standard-of-review purposes, we construe Grant's challenge to his 65-year sentence as a substantive Eighth Amendment appeal entitled to plenary review. *See United States v. Miknevich*, 638 F.3d 178, 185 (3d Cir. 2011).

As we explain below, Grant did not preserve his alternative argument that the sentencing-package doctrine required a resentencing on *all* counts of conviction. So we review that aspect of Grant's appeal under a plain-error standard. *See, e.g.*, *United States v. Price*, 458 F.3d 202, 206 (3d Cir. 2006) ("We apply plain error review when an issue was not brought to the attention of the district court.").

## III.     DISCUSSION

### A. Grant's *Miller* Challenge to His Sentence Fails.

Concessions by both sides cabin our review. For his part, Grant does not challenge the Eighth Amendment reasonableness or proportionality of his 65-year sentence. And the Government, in turn, concedes that a term-of-years sentence *may* be so long that it amounts—in our parole-shorn federal justice system—to de facto LWOP. Nor does the Government challenge the District Court's finding that Grant was not, at the time of his resentencing, so intractably corrupt as to warrant a determinate life sentence.

10

Hence the narrow question before us: Does Grant's lengthy sentence for a homicide that he committed as a juvenile violate *Miller*? We conclude that it does not, even if it amounts to de facto LWOP. The *Miller* bar on mandatory LWOP sentencing regimes is a prophylactic that entitles a juvenile homicide offender to a certain sentencing process, but not a particular sentencing outcome—a result that follows from the Supreme Court's decision in *Jones v. Mississippi*, 593 U.S. --, 141 S. Ct. 1307 (2021).

**1. *Miller* banned mandatory LWOP sentencing schemes for juveniles.** Our natural starting point is how the *Miller* Court framed its decision. The Court stated its holding narrowly: "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" 567 U.S. at 465; *see also id.* at 474 ("But the mandatory penalty schemes at issue here prevent the sentencer from taking account of these central considerations [regarding an offender's youth]. . . . And *Graham* [*v. Florida*, 560 U.S. 48 (2010)] makes plain these mandatory schemes' defects . . . ."). "[S]ufficient to decide the[] case[]," the Court wrote, was its "holding" that such mandatory LWOP sentencing "scheme[s] pose[] too great a risk of disproportionate punishment" because they "mak[e] youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence." *Id.* at 479. "[C]hildren are different," *id.* at 480, so sentencing "schemes" that preclude consideration of that fact by mandating LWOP for juveniles don't pass Eighth Amendment muster. *Id.* at 489.

*Miller* took pains to preserve LWOP for certain juvenile homicide offenders. Such a sentence may be appropriate, for example, in the "uncommon" case when crime and criminal

11

reflect "irreparable corruption." *Id.* at 479–80 (citing *Roper v. Simmons*, 543 U.S. 551, 573 (2005); *Graham*, 560 U.S. at 68). Indeed, the Court recognized that "about 15% of all juvenile life-without-parole sentences" then being served were non-mandatory sentences imposed at the discretion of a judge or jury. *Miller*, 567 U.S. at 484 n.10. Though it gestured once to *Graham*'s holding that "incorrigibility is inconsistent with youth," *id.* at 472–73 (quoting *Graham*, 560 U.S. at 72–73), the *Miller* Court did not otherwise discuss incorrigibility. And it used the phrase "meaningful opportunity to obtain release" only once—in a quoting parenthetical following a "cf." or "compare" citation to *Graham*, *id.* at 479 (quoting *Graham*, 560 U.S. at 75)—after unequivocally stating: "We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Id.* (citing *Graham*, 560 U.S. at 75).

In short, the Court in *Miller* held that penal regimes under which a juvenile homicide offender must be sentenced to LWOP violate the Eighth Amendment because they foreclose consideration of the offender's youth at the time of the offense.

*Miller*'s context discourages any attempt to extend its holding to discretionary sentences. Indeed, seven years earlier, the *Roper* Court—after holding that the Eighth Amendment barred execution of persons who were under 18 at the time of their capital crimes—affirmed a discretionary sentence of LWOP for a juvenile homicide offender. *See* 543 U.S. at 560, 578–79; *see also id.* at 572 (stating that LWOP sentences could deter juveniles to same extent as now-outlawed death sentences). Along with *Graham*, which categorically prohibited LWOP for juvenile non-homicide offenders, *Roper* formed the

12

foundation of the *Miller* Court's analysis. *See, e.g.*, *Miller*, 567 U.S. at 471–72. But unlike those cases, the Court in *Miller* "d[id] not categorically bar a penalty for a class of offenders or type of crime." *Id.* at 483. Instead, *Miller* "mandate[d] only that a sentencer *follow a certain process*—considering an offender's youth and attendant characteristics—before imposing a particular penalty." *Id.* (emphasis added). Consider also that Miller and the petitioner in his companion case, Jackson, both were serving mandatory life sentences. *See id.* at 466, 469. Whatever conclusions one might, in a vacuum, draw from some of *Miller*'s language, deciding the proper contours of discretionary LWOP sentences would not have benefited either Miller or Jackson. *See, e.g.*, *Cal. v. San Pablo & T. R. Co.*, 149 U.S. 308, 314 (1893) ("[T]he [Supreme] [C]ourt is not empowered to . . . declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it."). We thus appropriately construe *Miller*'s holding and regard any of its statements that might read on discretionary sentences as no more than *dicta*.

**2. *Montgomery* did not and could not expand *Miller*'s guarantee.** But what of *Montgomery*? There, the Court made *Miller* retroactive to cases on collateral review. 577 U.S. at 206, 212. Possibly to help cast *Miller* as creating a new substantive right retroactive for habeas petitioners, *see, e.g.*, *Schriro v. Summerlin*, 542 U.S. 348, 351–54 (2004), the *Montgomery* Court at times described *Miller* as sweeping broadly. For example, the Court wrote that "*Miller* did bar life without parole . . . for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." 577 U.S. at 209; *see also id.* at 208 ("[*Miller*] rendered life without parole an unconstitutional penalty for 'a class of defendants because of their status'—that is, juvenile offenders whose crimes

reflect the transient immaturity of youth." (quoting *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989)). Three dissenting justices believed that these characterizations of *Miller* did not reflect its holding. *See, e.g.*, *Montgomery*, 577 U.S. at 224–25 (Scalia, J., dissenting) ("[T]he majority is not applying *Miller*, but rewriting it."). And, in fact, the *Montgomery* majority prefaced its more expansive accounts of *Miller* with language emphasizing that *Miller*'s holding was limited to "mandatory life-without-parole sentences." *See, e.g.*, *id.* at 206 ("*Miller*'s prohibition on mandatory life without parole for juvenile offenders"), 208 ("the Court's holding in *Miller* that mandatory life-without-parole sentences for children pose too great a risk of disproportionate punishment" (cleaned up)). All the same, the *Montgomery* Court never referred to the "meaningful opportunity to obtain release" that *Graham* required states to afford juvenile non-homicide offenders.

So the question we must resolve is whether *Montgomery* expanded *Miller*'s prohibition to LWOP that a sentencer elects to impose after considering a juvenile homicide offender's youth in mitigation. The answer is simply "No."

For starters, expanding *Miller* to discretionary sentences would not have benefitted Montgomery himself. Like Miller and Jackson, Montgomery was serving a mandatory LWOP sentence. *Montgomery*, 577 U.S. at 194, 196. The Supreme Court cannot render advisory opinions. *See, e.g.*, *Clinton v. Jones*, 520 U.S. 681, 700 & n.33 (1997); *San Pablo*, 149 U.S. at 314. And the words of its decisions "are to be read in the light of the facts of the case under discussion." *Armour & Co. v. Wantock*, 323 U.S. 126, 132–33 (1944). Before the Court in *Montgomery* was *Miller*'s retroactivity, and nothing more: The question presented was "whether *Miller* adopts a new substan-

tive rule that applies retroactively on collateral review to people condemned as juveniles to die in prison." *Montgomery*, 577 U.S. at 197 (quoting certiorari petition). And before deciding whether to establish a new *Miller*-derived rule, the *Montgomery* Court presumably "ask[ed] whether such a rule would be applied retroactively *to the case at issue*." *Teague v. Lane*, 489 U.S. 288, 300–01 (1989) (plurality opinion) (emphasis added). Because Montgomery was subject to a mandatory LWOP sentence, proscriptions on discretionary LWOP sentencing regimes would not have applied retroactively to him.

Moreover, as a retroactivity case decided on collateral review from a final state conviction, *Montgomery* would not have created new rights for those sentenced discretionarily. The Supreme Court does not "ordinarily make retroactivity judgments at the time a new right is recognized." *Dodd v. United States*, 545 U.S. 353, 364 (2005) (Stevens, J., dissenting) (citing *Ring* v. *Arizona*, 536 U.S. 584 (2002) (applying *Apprendi v. New Jersey*, 530 U.S. 466 (2000), to determinations of death-penalty eligibility); *Schriro*, *supra* (concluding that *Ring* was not retroactive)); *accord, e.g.*, *Edwards v. Vannoy*, 593 U.S. --, 141 S. Ct. 1547, 1551–52 (2021) (deciding that jury unanimity criminal procedure rule newly announced in *Ramos v. Louisiana*, 590 U.S. --, 140 S. Ct. 1390 (2020), did not apply retroactively on collateral review). Instead, the Court addresses rights and retroactivity in separate cases, per *Teague*, *see* 489 U.S. at 306–10, "to ensure that gradual developments in the law over which reasonable jurists may disagree are not later used to upset the finality of state convictions valid when entered." *Sawyer v. Smith*, 497 U.S. 227, 234 (1990). The *Montgomery* Court even framed the "effect" of its decision in terms of whether States would be "require[d] . . . to relitigate sentences . . . in every case where a juvenile offender

15

received mandatory life without parole." 577 U.S. at 212. Because "*Miller* announced a substantive rule of constitutional law," *id.*, and *Montgomery* applied it retroactively, any language in *Montgomery* pertaining to discretionary LWOP sentencing regimes is not binding.

**3. *Jones* confirms that *Miller* requires only discretionary sentencing, not particular findings or outcomes.** To be sure, the District Court found at Grant's resentencing that he did not deserve LWOP. But that finding cannot breathe life into Grant's appeal. In *Jones v. Mississippi*, the Supreme Court concluded that the juvenile homicide offender's LWOP sentence was constitutional because "the sentence was not mandatory and the trial judge had discretion to impose a lesser punishment in light of Jones's youth." 141 S. Ct. at 1322. In "a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary and *constitutionally sufficient*" under *Miller* and *Montgomery*. *Id.* at 1313 (emphasis added). Unlike "sanity or a lack of intellectual disability," *id.* at 1315, "incorrigibility is not an eligibility criterion." *Id.* (likening youth to mitigating circumstance in capital case). And *Miller* did not "impose a categorical bar against life without parole for murderers under 18." *Id.* at 1316 (citing *Miller*, 567 U.S. at 483). Instead, *Miller* cited *Roper* and *Graham* for the proposition that "[y]outh matters in sentencing," which requires "that a sentencer [] have discretion to consider youth before imposing a life-without-parole sentence." *Id.*

The *Jones* Court, consistent with our narrow reading, confirmed that "*Montgomery* did not . . . add to *Miller*'s requirements." *Id.* at 1316–17 ("the Court granted certiorari [in *Montgomery*] not to consider whether the rule announced

16

in *Miller* should be expanded, but rather simply to decide whether *Miller*[]" applies to cases on collateral review). Both cases rested on the "key assumption" that "discretionary sentencing allows the sentencer to consider the defendant's youth, *and thereby helps ensure* that life-without-parole sentences are imposed only in cases where that sentence is appropriate in light of the defendant's age." *Id.* at 1318 (emphasis added). The Court's precedents only "require a *discretionary sentencing procedure*," which itself "has indeed helped make life-without-parole sentences for offenders under 18 relatively rare." *Id.* at 1322 (emphasis added) (cleaned up); *see also Miller*, 567 U.S. at 483 (mandating "only that a sentencer follow a certain process").

All of which is to say that the Court has guaranteed to juvenile homicide offenders only a sentencing procedure in which the sentencer must weigh youth as a mitigating factor. The Court has *not* guaranteed particular outcomes for either corrigible or incorrigible juvenile homicide offenders. If a sentencer imposes de jure or de facto LWOP after finding—gratuitously—that a defendant is corrigible, the vehicle for challenging the sentence is an as-applied Eighth Amendment claim based on disproportionality of the punishment to the crime and criminal. *Cf. Jones*, 141 S. Ct. at 1322 ("[T]his case does not properly present—and thus we do not consider—any as-applied Eighth Amendment claim of disproportionality . . . ."). Grant pursues no such challenge here. That a sentence both procedurally and substantively reasonable may yet motivate an appeal goes to show the unfortunate extent to which the Supreme Court's Eighth Amendment jurisprudence has abjured constitutional interpretation in favor of challenges based on Court-created prophylactic rules. *See, e.g.*, John F. Stinneford, *The Illusory Eighth Amendment*, 63 AM. U. L. REV.

17

437, 440 (2013) (lamenting Supreme Court's choice, seemingly motivated by error-cost minimization, to use "implementation rules as a substitute for constitutional interpretation" of Eighth Amendment issues).

Affirming what was implicit in *Miller* and *Montgomery*, the *Jones* Court held that the Eighth Amendment does not categorically prohibit sentencing *any* juvenile homicide offender to LWOP, so long as the sentencer has considered the offender's youth in mitigation. And "a discretionary sentencing procedure suffices to ensure individualized consideration of a defendant's youth." *Jones*, 141 S. Ct. at 1321. Such individualized consideration is all that *Miller* requires.

**4. Grant received the required *Miller* procedure.** Even if, as Grant argues, his 65-year sentence amounts to de facto LWOP, there is no *Miller* problem here. When a sentencer has discretion to impose a sentence of less than LWOP on a juvenile homicide offender, and exercises that discretion by considering the offender's youth, "we should not now add still more procedural requirements." *Id.* Grant, in fact, received the constitutionally required procedure, and that is clear from the transcript of his resentencing hearing.

The District Court imposed sentence after considering Grant's youth at the time of the offense as well as its attendant characteristics. For example, the district judge "look[ed] at the circumstances of this case in the light of what the defendant was at the time of the commission of his offense, and by that I mean he was a minor." A150. Continuing, the District Court recalled that "[h]e was a juvenile, 16 years old. He was a teenager." *Id.* "When one looks at his upbringing, the debilitating characteristics of youth, inherent in being a young person and

18

the limited decision-making abilities of a minor, it is clear to this Court that . . . Mr. Grant is not that rarest [] exception referenced in *Miller*, where the lifetime without parole is appropriate." A150–51. Further accounting for "the nature . . . of the defendant," the District Court "look[ed] specifically at the age that [Grant] had at the beginning of his involvement with this gang" and "at the fact that because of his youth, he did have some limitation in decision-making." A154. Only after giving such regard to Grant's youth at the time of his homicide offense did the judge sentence him to 65 years'—rather than de jure life—imprisonment.

Even so, Grant contends that the District Court improperly strayed from the "so-called *Miller* factors" by failing to articulate Grant's "[c]hronological age and its hallmark features," his "family and home environment," "the circumstances of the homicide offense," the possibility "that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth," and "the possibility of rehabilitation." Appellant's Br. 31–47 (quoting 567 U.S. at 477–78). But the *Miller* Court's recitation of these considerations occurred in its discussion of why mandatory LWOP sentencing "misses too much." 567 U.S. at 477. It was not a rigid procedural script for discretionary state regimes, let alone for federal sentences imposed—as Grant's was—after consideration of the §3553(a) factors. *Compare, e.g.*, *id.* at 478–79 (discussing what facts Jackson's sentencer "should look at" and what Miller's "sentencer needed to examine" before imposing LWOP).

Just as *Miller* does not require an incorrigibility finding but preserves "States' sovereign administration of their criminal justice systems," *Montgomery*, 577 U.S. at 211 (citing *Ford*

19

*v. Wainwright*, 477 U.S. 399, 416–17 (1986)), it mandates only "that a judge or jury . . . have the opportunity to consider mitigating circumstances before imposing" LWOP. *Miller*, 567 U.S. at 489; *accord Jones*, 141 S. Ct. at 1321 ("[A]n on-the-record sentencing explanation with an implicit finding of permanent incorrigibility is not dictated by any historical or contemporary sentencing practice . . . ."). This obligation jibes with the general latitude afforded sentencing courts. They need not explain their decisions in endless detail. It suffices that a district judge first calculate the Guidelines range and then state reasons, "even if brief," for imposing the sentence. *Rita v. United States*, 551 U.S. 338, 356–58 (2007) (instructing that sentencing judge need only "set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority"); *see also Jones*, 141 S. Ct. at 1321 ("Even when state law requires a sentencer to supply reasons, many States do not impose a formulaic checklist of topics or a magic-words requirement with respect to particular mitigating circumstances.").

Because the District Court imposed Grant's sentence after considering his youth at the time of the offense and related factors in mitigation, no *Miller* violation occurred. The District Court did not need to make any specific findings or incant any particular words en route to imposing that sentence. That it made a gratuitous corrigibility finding does not invalidate Grant's sentence—even if, as he claims, it amounts to de facto LWOP. Incorrigibility is not a sentence eligibility criterion. *Jones*, 141 S. Ct. at 1315. We will affirm Grant's 60-year sentence on Counts I and II.

**B. Grant Did Not Preserve His Sentencing-Package Argument, and Limiting His Resentencing to Counts I and II Was Not Plain Error.**

The District Court limited Grant's resentencing to Counts I and II: the RICO counts involving the homicide for which Grant was mandatorily sentenced to life imprisonment. Grant contends that he was entitled to a plenary sentencing on *all* his counts of conviction. He urges us to extend our Court's sentencing-package doctrine and vacate his 40-year concurrent sentences for the drug convictions.

The sentencing-package doctrine recognizes "a strong likelihood that the district court will craft a disposition in which the sentences on the various counts form part of an over-all plan." *United States v. Davis*, 112 F.3d 118, 122 (3d Cir. 1997) (quotation omitted). Thus, "[w]hen a *conviction* on one or more of the component counts is vacated, common sense dictates that the judge should be free to review the efficacy of what remains in light of the original plan, and to reconstruct the sentencing architecture upon remand." *Id.* (emphasis added) (quotation omitted). The district judge's goal in revisiting the overall sentencing plan after vacatur of a conviction is "to ensure that the punishment still fits both crime and criminal." *Id.* (quotation omitted).

Although *Miller* required vacatur of Grant's mandatory LWOP *sentence* imposed on Counts I and II, his *convictions* on those counts were not vacated. Still, Grant contends that he was entitled to a fresh sentencing on his drug-trafficking counts because the 40-year concurrent sentences originally imposed for those convictions were merely symbolic given his then-mandatory life sentence. To be sure, some statements in

Grant's 1992 sentencing transcript could be read to suggest that, in fact, the district judge sought "to send a message" by imposing long concurrent sentences for the drug-related offenses. A451. The problem lies not in the factual support for Grant's position but in defense counsel's failure to preserve this argument and, in turn, the lack of precedent applying the sentencing-package doctrine when only a sentence is vacated.

Grant concedes that his counsel did not explicitly raise a sentencing-package argument at resentencing. That forfeiture would normally limit us to reviewing for plain error. *See, e.g.*, *Price*, 458 F.3d at 206. But Grant seeks de novo review because his counsel repeatedly argued to the District Court that he should be resentenced on all his counts of conviction.

Before the District Court, the closest defense counsel came to raising Grant's sentencing-package argument was asking for a full resentencing because Grant's sentences across the multiple counts were "all part and parcel of one sentence [of life without parole]." Appellant's Reply Br. 22 (quoting A40). But rather than cite any sentencing-package case law, defense counsel invoked "the spirit of *Miller*" in arguing for this full and fresh resentencing, A43, and claimed that letting the 40-year drug-trafficking sentence stand "is not really consistent with what *Miller* is talking about." A85. Small wonder, then, that the District Court understood counsel to be arguing that "the sentence as a whole was offensive to the *Miller* concept." A44.

Articulated as a *Miller* adjunct, defense counsel's argument for a full resentencing did not suffice to put the District Court or the Government on notice that what Grant really sought was an extension of our Court's sentencing-package

22

doctrine to vacated sentences. Such a change in our sentencing paradigm would entail nothing unique to juvenile offenders; it would seemingly obtain when *any* multi-conviction defendant's life or lengthy term-of-years sentence is vacated while lesser sentences remain intact. To preserve an argument for appeal, a party "must have raised the same *argument* in the District Court—merely raising an *issue* that encompasses the appellate argument is not enough." *United States v. Joseph*, 730 F.3d 336, 337 (3d Cir. 2013); *see also Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 558 (3d Cir. 2017) ("Theories not raised squarely [before the District Court] cannot be surfaced for the first time on appeal."). With only the semantic similarity between "package" and "part and parcel," defense counsel's advocacy was, at best, a "vague allusion" to the key sentencing-package issue that does "not suffice to preserve it for appeal." *United States v. Dupree*, 617 F.3d 724, 728 (3d Cir. 2010) (quoting *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 262 (3d Cir. 2009)).

Left with plain-error review, Grant cannot prevail. Recall: The sentencing-package doctrine provides a basis for a de novo resentencing when "a *conviction* on one or more of the component counts is vacated." *Davis*, 112 F.3d at 122 (emphasis added) (quotation omitted); *see also Dean v. United States*, 137 S. Ct. 1170, 1176 (2017) (explaining that sentencing-package cases "typically involve . . . a successful attack by a defendant on some but not all *of the counts of conviction*" (emphasis added) (quoting *Greenlaw v. United States*, 554 U.S. 237, 253 (2008))). The doctrine has been applied in our precedential opinions only to vacated convictions—not

23

vacated sentences.[5]  But Grant's convictions have never been disturbed.  While one of our sister circuits has applied the judge-made doctrine to a vacated sentence, *see United States v. Catrell*, 774 F.3d 666, 670 (10th Cir. 2014), our precedent does not extend that far.  And the District Court's failure to broaden the doctrine was not a "clearly erroneous application of statutory law."  *United States v. Cole*, 567 F.3d 110, 117 (3d Cir. 2009) (quotation omitted).  So any error in limiting Grant's resentencing to Counts I and II was not plain because it was not "clear under current law."  *United States v. Olano*, 507 U.S. 725, 734 (1993).[6]

---

[5] In two non-precedential opinions, we have applied the sentencing-package doctrine to vacated sentences.  *See United States v. Fumo*, 513 F. App'x 215 (3d Cir. 2013); *United States v. Brown*, 385 F. App'x 147 (3d Cir. 2010).  Given those decisions' lack of precedential status, we cannot rely on them.  *See* Internal Operating Procedures of the United States Court of Appeals for the Third Circuit, 5.7 (January 2017) ("The court by tradition does not cite to its not precedential opinions as authority.").  And we did not adopt the sentencing-package doctrine until 1997, *see Davis*, 112 F.3d at 122, ten years after issuing the precedential opinion that Grant cites for the notion that the doctrine applies when a sentence alone is vacated, *United States v. Guevremont*, 829 F.2d 423 (3d Cir. 1987).

[6] We exempt from this holding the District Court's imposition of a 60-year concurrent sentence for Grant's conviction on Count IV.  The Court decided to limit resentencing to Counts I and II but then increased Grant's Count IV sentence from 40 to 60 years.  We will vacate this portion of the District Court's judgment and remand with instructions for the Court to correct its inadvertent sentencing error.

## IV.  CONCLUSION

What matters for *Miller* purposes is whether the sentencer considered a juvenile homicide offender's youth and attendant characteristics before sentencing him or her to LWOP.  The District Court did so at resentencing, repeatedly stressing Grant's status as a juvenile offender, his young age when he first became involved with the E-Port Posse, and his limited decision-making abilities as a minor.  Regardless of whether it yields an aggregate sentence of de facto LWOP, we will affirm Grant's 60-year sentence on Counts I and II because he received all that he was entitled to under *Miller*.  We will vacate and remand for the sole purpose of allowing the District Court to correct its erroneous increase of Grant's concurrent sentence on Count IV from 40 to 60 years.  Finally, whatever the merits of extending our sentencing-package doctrine beyond vacated convictions to vacated sentences, Grant's counsel forfeited that argument before the District Court—and it was not plain error to limit Grant's *Miller* resentencing to his homicide-related counts.

HARDIMAN, *Circuit Judge*, concurring, with whom JORDAN, BIBAS, and PORTER, *Circuit Judges* join:

I agree with the majority and join its opinion in full. I write separately to expand on the Court's astute observation that "the Supreme Court's Eighth Amendment jurisprudence has abjured constitutional interpretation in favor of challenges based on Court-created prophylactic rules."[1]

In *Miller v. Alabama*, the Supreme Court held unconstitutional mandatory life sentences without the possibility of parole for juvenile offenders.[2] In doing so, the Court applied "the evolving standards of decency."[3] That approach displaces the text of the Eighth Amendment in favor of a nebulous test. And it requires courts to divine the prevailing moral sentiment at the time of sentencing, which has led to the different approaches to the Eighth Amendment issue in this case. I hope to explain how that confusion made its way into our caselaw—and why it leaves courts without adequate guidance. The majority opinion is based on a careful—and in my view accurate—recapitulation of Supreme Court precedent. But Judge Greenaway's concurrence has a point: the "meaningful opportunity for release" principle finds support in the caselaw and could fit naturally within the Supreme Court's "evolving standards of decency" test. But that test has two serious problems: its provenance is illegitimate, and its

---

[1] Maj. Op. at 17.

[2] 567 U.S. 460, 489 (2012).

[3] *Id.* at 469–70 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).

1

application empowers judges to exercise unbounded discretion.

I

A

The "evolving standards of decency" first appeared in *Trop v. Dulles*,[4] a 1958 decision offering an especially weak justification for the Court to abandon the Eighth Amendment's text. A careful examination of *Trop* shows that "the evolving standards of decency" test is "bad wine of recent vintage."[5]

In 1944, American Private Albert Trop escaped from the stockade while deployed abroad, but the United States Army quickly captured him.[6] A court martial convicted Trop of desertion, dishonorably discharged him, and sentenced him to three years' hard labor and salary forfeiture. Eight years later, Trop was denied a United States passport because, by statute, desertion forfeited his citizenship.[7]

Trop sued, and the district court entered judgment against him.[8] The Second Circuit, with Judge Learned Hand writing, affirmed the district court. Chief Judge Clark dissented, contending that Trop's Eighth Amendment right to

---

[4] *See* 356 U.S. 86 (1958) (plurality opinion).

[5] *Cf. TRW Inc. v. Andrews*, 534 U.S. 19, 37 (2001) (Scalia, J., concurring in judgment).

[6] *Trop*, 356 U.S. at 87.

[7] *Id.* at 88.

[8] *Id.*

2

be free from cruel and unusual punishment was violated.[9] In the majority opinion, Judge Hand explicitly refused to address the Eighth Amendment argument for four reasons. It was not pleaded in the complaint, argued on summary judgment, cited by the district judge, or mentioned at argument before the Second Circuit.[10] According to Judge Hand, the closest Trop came to arguing the point was a passing reference that expatriation violates due process.[11]

Chief Judge Clark's dissent was just two paragraphs. In lieu of judicial reasoning, he "merely incorporate[d] by reference" a law review comment because he "doubt[ed] if [he] c[ould] add to the persuasive arguments there made."[12] The comment argued that expatriation constituted cruel and unusual punishment, and Chief Judge Clark apparently found the argument so persuasive that a mere citation sufficed to justify his dissent.[13]

Trop appealed. In a 4-1-4 decision, the Supreme Court reversed the Second Circuit.[14] Writing for a plurality, Chief Justice Earl Warren began by referencing a companion case,

---

[9] *Trop v. Dulles*, 239 F.2d 527 (2d Cir. 1956).

[10] *Id*. at 529–30.

[11] *Id*. at 530.

[12] *Id*. (Clark, C.J., dissenting) (citing Comment, *The Expatriation Act of 1954*, 64 YALE L.J. 1164, 1189–99 (1955)).

[13] *See id.*; *see also The Expatriation Act of 1954*, *supra* note 12, at 1178–82.

[14] *Trop*, 356 U.S. at 91.

*Perez v. Brownell*,[15] and stated that the principles espoused there essentially decided *Trop*.[16] The Chief Justice explained that the national government lacks the power to deprive Americans of citizenship involuntarily, though citizens may expatriate themselves voluntarily.[17] After just three paragraphs, Chief Justice Warren concluded: "On this ground alone the judgment in this case should be reversed."[18] Though that was enough to decide the case, he did not end his opinion there. Instead, he turned to the unrelated Eighth Amendment question. In doing so, Chief Justice Warren waxed historical: "The Court recognized in [*Weems v. United States*, 217 U.S. 349 (1910)] that the words of the Amendment are not precise, and that their scope is not static. The Amendment must draw its meaning from *the evolving standards of decency that mark the progress of a maturing society*."[19] With this dictum— involving an issue the Second Circuit explicitly refused to address and that was unnecessary to the decision in *Trop*—the Supreme Court planted a seed that has sprouted into controlling Eighth Amendment law some sixty years later and will continue to vex the inferior federal courts in cases like Corey Grant's.

The "evolving standards of decency" became the law of the land against substantial odds. The phrase went unmentioned in the Supreme Court for ten years after *Trop*,

---

[15] 356 U.S. 44 (1958).

[16] *Trop*, 356 U.S. at 91–92.

[17] *Id.* at 92–93.

[18] *Id.* at 93.

[19] *Id.* at 100–01 (emphasis added).

4

until it surfaced in a footnote in a death-penalty case.[20] And it was then quoted only in passing in seven death-penalty cases in the 1970s.[21]

B

Nearly two decades after its introduction in *Trop*, the phrase was mentioned for the first time in a non-capital case, *Estelle v. Gamble*.[22] There, Gamble claimed the prison failed to provide him adequate medical care in violation of the Eighth Amendment.[23] The district court dismissed the case for failure to state a claim, but the Fifth Circuit reversed.[24] The Supreme Court reversed the Fifth Circuit and ruled against Gamble on the facts as pleaded.[25] Yet Justice Thurgood Marshall, writing for the Court, discussed the evolving constitutional law in this area and wrote: "we have held repugnant to the Eighth Amendment punishments which are incompatible with 'the

---

[20] *Witherspoon v. Illinois*, 391 U.S. 510, 519 n.15 (1968).

[21] *McGautha v. California*, 402 U.S. 183, 202 (1971); *Furman v. Georgia*, 408 U.S. 238, 242 (1972) (Douglas, J., concurring); *McLamore v. South Carolina*, 409 U.S. 934, 936 (1972) (Douglas, J., dissenting from denial of ceriorari); *Sellars v. Beto*, 409 U.S. 968, 970–71 (1972) (Douglas, J., dissenting); *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (plurality opinion); *Woodson v. North Carolina*, 428 U.S. 280, 301 (1976) (plurality opinion); *Roberts v. Louisiana*, 428 U.S. 325, 336 (1976) (plurality opinion).

[22] 429 U.S. 97, 102 (1976).

[23] *Id.* at 101–02.

[24] *Gamble v. Estelle*, 516 F.2d 937 (5th Cir. 1975).

[25] *Gamble*, 429 U.S. at 107–08.

evolving standards of decency that mark the progress of a maturing society.'"[26] With that statement, the Court first established the evolving standards of decency as a constitutional test.

While Justice Marshall accurately quoted *Trop*, it was not, as he suggested, the Court's holding. Recall that Chief Justice Warren stated that the Eighth Amendment must "draw its meaning" from the evolving standards of decency—he did not establish a new, "evolving" constitutional test.[27] So the Court in *Estelle v. Gamble* made an unwarranted promotion from *Trop*'s dicta to a constitutional test.

The test lay dormant for years, until it reappeared as a standard bearer for the view that the Constitution's meaning changes over time. That process began during the 1980s. The test was first mentioned in several dissents in death penalty cases before it appeared in a 1987 majority opinion written by Justice Powell.[28] Two years later, Justice O'Connor's majority opinion in *Penry v. Lynaugh* used the standard again, but there the Court held that executing a man with mental disabilities did *not* violate the Eighth Amendment.[29] *Penry* was overruled in 2002 in *Atkins v. Virginia*, which held there was a national consensus against executing the mentally disabled.[30] Writing

---

[26] *Id.* at 102 (quoting *Trop*, 356 U.S. at 101).

[27] *Trop*, 356 U.S. at 100–03.

[28] *McCleskey v. Kemp*, 481 U.S. 279, 300 (1987).

[29] *Penry v. Lynaugh*, 492 U.S. 302, 330–31, 340 (1989).

[30] *Atkins v. Virginia*, 536 U.S. 304, 316–17 (2002).

6

for the Court in *Atkins*, Justice Stevens cited *Trop* and the evolving standards of decency.[31]

In 2005, the Court decided *Roper v. Simmons*, where a 5-4 decision effectively overruled a 1989 decision (*Stanford v. Kentucky*), which had rejected the proposition that the Constitution bars capital punishment for juvenile offenders.[32] In *Roper*, 17-year-old Christopher Simmons said he and his co-conspirators could "get away with" murder because they were minors.[33] The Supreme Court, Justice Kennedy writing, reasoned that *Thompson v. Oklahoma*'s logic, proscribing the death penalty for those younger than 16, applied with equal force to those under 18.[34] Justice Kennedy also noted that the United States was the only country that permitted juvenile executions.[35] Justice Stevens (joined by Justice Ginsburg) concurred, venturing that our Constitution changes sometimes.[36]

Justice O'Connor dissented. As did Justice Scalia, who was joined by Chief Justice Rehnquist and Justice Thomas.

---

[31] *Id.* at 311–12. In his *Atkins* dissent, Justice Scalia cited *Trop*'s language not because he believed it was a proper analytical tool, but to argue that even applying that standard, there was no consensus against the practice because 18 states (or 47% of the death penalty states) permitted the execution of the mentally disabled. *Id.* at 341–43 (Scalia, J., dissenting).

[32] 543 U.S. 551 (2005).

[33] *Id.* at 556.

[34] *Id.* at 570–71.

[35] *Id.* at 575.

[36] *Id.* at 587 (Stevens, J., concurring).

Significant for our purposes, Justice O'Connor accepted the premise that the Eighth Amendment is not static and must draw its meaning from the evolving standards of decency.[37] Justice Scalia rejected that premise. Instead, he cited Federalist 78 and wrote: "What a mockery today's opinion makes of Hamilton's expectation, announcing the Court's conclusion that the meaning of our Constitution has changed over the past 15 years—not, mind you, that this Court's decision 15 years ago was *wrong*, but that the Constitution *has changed*."[38]

C

With this evolving understanding in mind, the Court applied the test in earnest. In 2008, in a 5-4 decision, the Court decided *Kennedy v. Louisiana*, which held unconstitutional a Louisiana statute that provided for the death penalty for a defendant who rapes a child when the crime neither resulted in, nor was intended to result in death.[39] Writing for the Court, Justice Kennedy started with the proportionality principle mentioned by the Court in its 1910 decision in *Weems*.[40] He then cited *Trop* for the proposition that the Eighth Amendment draws meaning from the evolving standards of decency and

---

[37] *See id.* at 594, 604 (O'Connor, J., dissenting). In *Roper*, Justice O'Connor also criticized the Missouri Supreme Court's failure to follow *Stanford*, which she called clear error. *Id*. at 593–94. She also noted that since *Stanford*, six states had executed people under 18. *Id*. at 595. And there was no genuine national consensus on this matter as there were over 70 juveniles on death row in 12 states. *Id*. at 596.

[38] *Id.* at 608 (Scalia, J., dissenting).

[39] 554 U.S. 407 (2008).

[40] *Id.* at 419.

8

noted that social standards embody variable moral judgments.[41]

In 2010, the Court held unconstitutional a life-without-parole sentence for a man who committed armed burglary five weeks before his eighteenth birthday.[42] Justice Kennedy began his legal analysis by quoting *Trop*'s evolving standards of decency.[43]

In 2012, the Court issued yet another 5-4 opinion, this time with Justice Kagan writing. In *Miller v. Alabama*, the Court held that mandatory life sentences without the possibility of parole violated the Eighth Amendment rights of two 14-year-old offenders whom the states had tried as adults and convicted of murder.[44] Justice Kagan began her legal analysis by quoting *Trop*, and she reiterated the primacy of the evolving standards of decency that mark the progress of a maturing society.[45] She reasoned that the case implicated two strands of

---

[41] *Id.*

[42] *Graham v. Florida*, 560 U.S. 48 (2010).

[43] *Id.* at 58.

[44] *Miller v. Alabama*, 567 U.S. 460, 465–66, 468 (2012). In *Miller*, one murder involved the shooting of a video store proprietor during a robbery in which defendant Jackson was a co-conspirator. *Id.* at 465–66. The second murder was particularly heinous, with Miller beating a man with a baseball bat while proclaiming: "I am God, I've come to take your life." *Id.* at 468. Miller and his co-conspirators returned to burn down the victim's trailer. *Id.*

[45] *Id.* at 469.

precedent about "proportionate punishment."[46] The confluence of those two lines suggested that mandatory life without the possibility of parole for juveniles violated the Eighth Amendment.[47] But she concluded, as the majority opinion rightly notes in the case before us, that the Court's decision mandated only a certain *process* (*i.e.*, consider the offender's youth) before imposing a particular penalty.[48]

And in 2014, the Court issued another 5-4 Eighth Amendment decision in *Hall v. Florida*.[49] In his opinion for the Court, Justice Kennedy again began by referencing the evolving standards of decency.[50] The opinion focused on IQ-score social science. Among other considerations, it emphasized that experts recognize the test's imprecision. Noting that intellectual disability is a condition, not a number, Justice Kennedy wrote that "[a] State that ignores the inherent imprecision of these tests risks executing a person who suffers from intellectual disability."[51]

Such is the history of the evolving standards of decency test. It is marked by an illegitimate pedigree and the

---

[46] *Id.* at 470.

[47] *Id.*

[48] *Id.* at 483.

[49] 572 U.S. 701 (2014).

[50] *Id.* at 708; *see also id.* at 708–09 (discussing policy rationales).

[51] *Id.* at 723.

10

substitution of judicial preferences about penological policy for the will of the People.[52]

## II

The cases just discussed produced vigorous dissents. And those dissents highlight why the caselaw provides insufficient guidance.

For example, consider the dissents in *Miller*. Chief Justice Roberts noted that although the case presented "grave and challenging questions of morality and social policy," the majority did not characterize life without the possibility of parole for juveniles as "unusual."[53] He then observed that some 2,500 prisoners were serving life without parole for murders committed before age 18.[54] Noting that it was not unusual for murderers to receive that sentence,[55] the Chief Justice wrote: "[D]ecency is not the same as leniency. A decent society protects the innocent from violence."[56] And "[t]o say that a sentence may be considered unusual *because* so many legislatures approve it stands precedent on its head."[57] He criticized the majority for invalidating laws of dozens of state legislatures and Congress.[58] Finally, he argued that *Roper* and

---

[52] *E.g.*, *Graham*, 560 U.S. at 67.

[53] *Miller*, 567 U.S. at 493 (Roberts, C.J., dissenting).

[54] *Id*. at 493–94.

[55] *Id.* at 494.

[56] *Id*. at 495.

[57] *Id*. at 497.

[58] *Id*. at 498.

*Graham* did not compel the Court's decision.[59] *Graham* said that "there is a line between homicide and other serious violent offenses."[60] And *Roper* said the death penalty for juveniles was unnecessary precisely because life without parole is available.[61] He concluded with a warning: "This process has no discernible end point."[62]

In a separate dissent joined by Justice Scalia, Justice Thomas wrote that neither line of precedent that the majority relied on adhered to the original understanding of the Cruel and Unusual Punishments Clause.[63] Based on that understanding, the Clause does not have a proportionality principle.[64] Justice Thomas concluded by explaining the Court was trying to shift from "'merely' divining the societal consensus of today to shaping the societal consensus of tomorrow."[65]

Justice Alito also dissented, joined by Justice Scalia. He quoted *Trop*'s evolving language and argued that it was

---

[59] *Id*. at 499.

[60] *Id*. (internal quotation marks and citation omitted).

[61] *Id*. at 500.

[62] *Id.* at 501.

[63] *Id.* at 502 (Thomas, J., dissenting).

[64] *Id.* at 503–04. As Justice Thomas recognized in dissent, *id.* at 507, the Court had declined extending the individualized sentencing rule beyond the death penalty context some twenty years prior: "There can be no serious contention . . . that a sentence which is not otherwise cruel and unusual becomes so simply because it is 'mandatory,'" *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991).

[65] *Miller*, 567 U.S. at 509.

problematic from the start.[66] Justice Alito asked: "Is it true that our society is inexorably evolving in the direction of greater and greater decency? Who says so . . . ?"[67] He concluded by stating the Court's "Eighth Amendment cases are no longer tied to any objective indicia of society's standards."[68]

Justice Alito also dissented in *Hall*, mentioning the evolving standards language. In his view: "[W]hen the Court referred to the evolving standards of a maturing 'society,' the Court meant the standards of American society as a whole. Now, however, the Court strikes down a state law based on the evolving standards of professional societies."[69] He also noted "the Court has long held that laws enacted by state legislatures provide the clearest and most reliable objective evidence of contemporary values."[70] Justice Alito criticized the Court for tying its decision to the opinions of "a small professional elite."[71] And "because the views of professional associations

---

[66] *Id.* at 510 (Alito, J., dissenting).

[67] *Id.*

[68] *Id.* at 514.

[69] *Hall*, 572 U.S at 725 (Alito, J., dissenting) (emphasis omitted).

[70] *Id.* at 726 (cleaned up). Justice Alito found no consensus among states about how to define "intellectually disabled." *Id*. at 726–27. And he claimed the Court should not count states that have abolished the death penalty because, "[t]he fact that a State has abolished the death penalty says nothing about how that State would resolve the evidentiary problem of identifying defendants who are intellectually disabled." *Id*. at 729–30.

[71] *Id*. at 731.

often change, tying Eighth Amendment law to these views will lead to instability and continue to fuel protracted litigation."[72]

In sum, these dissents highlight that the Court has strayed far from the text and original meaning of the Eighth Amendment. And they also show that the Court has applied the evolving standards of decency inconsistently.[73]

\*　　\*　　\*

The story of the evolving standards of decency test—from its questionable creation in *Trop v. Dulles*, through a decade of dormancy, its recurrence in death penalty cases, and its recent transformation into the law of the land—has created more problems than it has solved. Its inscrutable standards require judges to eschew the law as written in favor of moral sentiment. The only constant is that more and more laws adopted by the People's representatives have been nullified. And the People have no practical way to reverse this contrived ratchet.

This Court, relying on a careful review of the Supreme Court's Eighth Amendment precedents, reaches the right conclusion for the right reason. But if the Supreme Court continues to apply "the evolving standards of decency" test, I wonder what will be the next stop on this runaway train of

---

[72] *Id.* at 731–32 (footnote omitted).

[73] *See, e.g.*, John F. Stinneford, *Evolving Away from Evolving Standards of Decency*, 23 FED. SENT'G REP. 87, 88–89 (2010) (delineating the current test's erosion); *id.* at 89–90 (applying the original meaning to come to consistent results with a stable test).

elastic constitutionalism? As Chief Justice Roberts cautioned nine years ago: there is "no discernable end point."[74]

---

[74] *Miller*, 567 U.S. at 501 (Roberts, C.J., dissenting).

GREENAWAY, JR., *Circuit Judge*, concurring.  RESTREPO, *Circuit Judge*, joins.  KRAUSE, *Circuit Judge*, joins Section II.

When the Supreme Court teaches, we are bound to listen.  When the Court speaks a phrase, a sentence, or a 100-page opinion, we as lower courts must heed.

I disagree with the Majority's position that *Jones v. Mississippi*, 141 S. Ct. 1307 (2021) controls this case.  Instead, I believe it is controlled by the Supreme Court's binding case law concerning corrigible youth.  The Supreme Court's determination in *Miller v. Alabama* that the Eighth Amendment requires sentencing courts to afford non-incorrigible juvenile homicide offenders a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" plays no role in my colleagues' writing.  567 U.S. 460, 479 (2012) (quoting *Graham v. Florida*, 560 U.S. 48, 75 (2010)).  Thus, I only concur in the judgment as to Section III.A of the majority opinion.  I join Section III.B of the majority opinion in toto.

I.

In my view, *Jones* does not impact the ultimate resolution of the case before us.  Under *Jones*, a sentencing court need not make a finding of permanent incorrigibility before sentencing a juvenile homicide offender to life without parole.  *Jones*, 141 S. Ct. at 1321.  *Jones* provides that such a sentence complies with the Eighth Amendment so long as the sentence is discretionary and the sentencing court considered youth as a mitigating factor.  *Id.* at 1313.

1

I appreciate that my colleagues in the majority believe that the effect of *Jones* on *Miller* (and on the matter before us) is that of its holdings regarding constitutionality and remedy—that is, whether the sentencing court must consider youth as a mitigating factor and make a corrigibility finding—are necessarily dispositive at the initial stage of the sentencing process. But here, the facts implicate a point in the sentencing court's decision-making process that is outside the ambit of *Jones*.

The question before us is not whether a finding of permanent incorrigibility is necessary pursuant to *Miller*. That question became moot when the District Court made its on-the-record finding that Corey Grant is capable of reform. *See* App. at 151 ("Mr. Grant is not that rarest of exception[s] referenced in Miller, where the lifetime without parole is appropriate."). Instead, the question before us—which *Jones* does not resolve—is whether a defendant already found to be corrigible may benefit from *Miller*'s holding that non-incorrigible juvenile homicide offenders are entitled to a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Miller*, 567 U.S. at 479 (quoting *Graham*, 560 U.S. at 75).[1]

*Jones* does not eviscerate *Miller*. *See Jones*, 141 S. Ct. at 1321 (*Jones* "does not overrule *Miller* or *Montgomery*"); *see*

---

[1] Consistent with this pronouncement in *Graham*, the Court also noted in *Miller* that "[l]ife without parole . . . [is] at odds with a child's capacity for change." 567 U.S. at 473. That *Miller* did not categorically prohibit LWOP altogether does not mean that it permits LWOP sentences for juvenile homicide offenders who are not incorrigible.

*also id.* at 1337 ("For present purposes, sentencers should hold this Court to its word: *Miller* and *Montgomery* are still good law. . . . Sentencers are thus bound to continue applying those decisions faithfully.") (Sotomayor, J., dissenting). As Justice Kavanaugh highlighted: "[o]n the question of what *Miller* required, *Montgomery* was clear: 'A hearing where youth and its attendant characteristics are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not.'" *Id.* at 1317-18 (quoting *Montgomery v. Louisiana*, 577 U.S. 190, 210 (2016)). If *Miller* and *Montgomery* are not overturned, as the *Jones* Court made clear, then courts are still bound by the holdings of those cases. *See Montgomery*, 577 U.S. at 209 ("*Miller* did bar life without parole . . . for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility."). If *Miller* and *Montgomery* have no continued vitality beyond their narrowest holdings, the *Jones* Court easily could have said so.

Indeed, *Jones* enlivens both *Miller* and *Montgomery* by creating a framework of analysis for the key questions in this area, which are: (1) whether youth is to be considered as a mitigating factor, and (2) whether life without parole ("LWOP") can be mandatory. As stated above, *Jones* determines the question of whether a juvenile homicide offender is entitled to a hearing to determine permanent incorrigibility. But it does not resolve the question of what happens when an affirmative finding of corrigibility has been made. And in *Jones*, the Supreme Court specifically contemplated that there may be state regimes in which the sentencer must make a finding as to the defendant's corrigibility. *See Jones*, 141 S. Ct. at 1323 ("States may require sentencers to make extra factual findings before

3

sentencing an offender under 18 to life without parole.").  If *Miller*'s requirement that a non-incorrigible juvenile homicide offender be afforded a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" does not remain, then what is the purpose of *Jones*'s unequivocal assertion that *Miller* and *Montgomery* have continued vitality?

My colleagues in the majority note that the *Miller* Court "used the phrase 'meaningful opportunity to obtain release' only once—in a quoting parenthetical following a 'cf.' or 'compare' citation to *Graham.*"  Majority Op. at 12.  "[M]eaningful opportunity to obtain release" has been a consistent theme in three Supreme Court cases:  *Graham*, 560 U.S. at 82 ("A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term."), *Miller*, 567 U.S. at 479 (state must provide "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation") (quoting *Graham*, 560 U.S. at 75), and *Montgomery*, 577 U.S. at 212 ("The opportunity for release will be afforded to those who demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change.").  *Jones*'s predecessors instruct us what the Constitution requires when a corrigibility finding has been made.

*Graham* teaches that a sentence that does not meet penological objectives is "by its nature disproportionate to the offense" and therefore constitutionally infirm, and that juvenile LWOP is only penologically justified for the incorrigible.  560 U.S. at 71, 72–73.  *Graham* formed the "foundation stone" of *Miller*'s analysis, *Miller*, 567 U.S. at 470 n.4, and subsequent

4

decisions underscore *Graham*'s lessons. *Montgomery* affirms that *Miller* "established that the penological justifications for life without parole collapse in light of 'the distinctive attributes of youth.'" 577 U.S. at 208 (quoting *Miller*, 567 U.S. at 472). Further, *Montgomery* explains that *Miller* drew a constitutional "line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption." *Id.* at 209.[2] The *Montgomery* Court

---

[2] As is true with any finding of corrigibility, youth must be taken to account. The *Miller* Court requires that the sentencing court "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison" before imposing LWOP. 567 U.S. at 480. Thus, the *Miller* Court enumerated various considerations that can be used to determine whether a juvenile offender is incorrigible:

- "[C]hronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." *Id.* at 477.

- "[T]he family and home environment that surrounds [the juvenile offender]—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional." *Id.*

- "[T]he circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him." *Id.*

- "[T]hat he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers

5

held that *Miller* announced a substantive rule of constitutional law because "juvenile offenders whose crimes reflect the transient immaturity of youth" constitute a class of defendants upon whom LWOP cannot be imposed. *Id.* at 208. Thus, *Miller* instructs that such a defendant should have a meaningful opportunity to obtain release.

II.[3]

However one reads *Jones*, neither it nor today's Majority changes what the meaningful opportunity standard requires. To determine what constitutes a meaningful opportunity to obtain release, we look to the Supreme Court's original diagnosis of the constitutional infirmity that plagues juvenile LWOP. *See Casey v. Planned Parenthood of Se. Pa.*, 14 F.3d 848, 857 (3d Cir. 1994) ("We must look to the language of the Supreme Court's opinion to see what it

---

or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys." *Id.* at 477–78.

- "[T]he possibility of rehabilitation . . . ." *Id.* at 478.

[3] Even if one interprets *Jones* as the Majority does, the meaningful opportunity standard continues to govern in cases involving juvenile non-homicide offenders. *See Jones*, 141 S. Ct. at 1314; *Graham*, 560 U.S. at 75. The discussion that follows thus provides guidance to district courts confronting Eighth Amendment claims brought by such offenders.

intend[s] . . . .").[4] In holding that juvenile LWOP is not an appropriate sentence for non-homicide offenders in light of an offender's capacity for change and limited culpability, the Court viewed the problem with the punishment as more profound than just denial of release:

> [A] categorical rule [barring LWOP] gives all juvenile nonhomicide offenders a chance to demonstrate maturity and reform. The juvenile should not be deprived of the opportunity to achieve maturity of judgment and self-recognition of human worth and potential . . . . Life in prison without the possibility of parole gives no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope.

---

[4] Whether "meaningful opportunity to obtain release" evolves from the Supreme Court's application of "the evolving standards of decency" is of no moment. *Miller*, 567 U.S. at 479; Concurring Op. at 1. Judge Hardiman's objections to decades of Supreme Court case law do not aid district courts in the difficult task of determining what is a just sentence given a horrible crime committed by a juvenile whose youth is a mitigating factor. Further, our explication of *Graham*, *Miller*, and *Montgomery* does not represent an extension of the holdings pronounced in those cases. Lastly, *Jones* accords unfettered discretion to any sentencing court to mete out a sentence of any term of years or life without parole if youth is considered and a discretionary sentencing scheme is invoked. A consideration of meaningful opportunity to obtain release does nothing to impede the exercise of that discretion.

7

*Graham*, 560 U.S. at 79; *see also id*. at 69-70 ("[LWOP] deprives the convict of . . . hope of restoration"); *id*. at 73 ("A life without parole sentence improperly denies the juvenile offender a chance to demonstrate growth and maturity.").

This passage conveys the essence of what a "meaningful opportunity to obtain release" is: a non-incorrigible juvenile offender must be afforded an opportunity for release at a point in his or her life that still affords "fulfillment outside prison walls," "reconciliation with society," "hope," and "the opportunity to achieve maturity of judgment and self-recognition of human worth and potential." *Id*. at 79. That is, the requirement encompasses more than mere physical release at a point just before a juvenile offender's life is expected to end.

The contours of the meaningful opportunity to obtain release requirement are also informed by the Court's concern that "defendants serving life without parole sentences are often denied access to vocational training and other rehabilitative services that are available to other inmates." *Id.* at 74; *see also id*. at 79 ("[I]t is the policy in some prisons to withhold counseling, education, and rehabilitation programs for those who are ineligible for parole consideration.").[5] This view illustrates the Court's belief that—in order to afford "hope" and a chance for "fulfillment outside prison walls,"

---

[5] This same concern—lack of vocational training—also animated the Court to adopt a categorical rule in *Graham*, rather than a case-by-case approach, in order to "avoid[] the perverse consequence in which the lack of maturity that led to an offender's crime is reinforced by the prison term." *Graham*, 560 U.S. at 79.

"reconciliation with society," and "self-recognition of human worth and potential," consistent with the Eighth Amendment, *id*. at 79—the State must give non-incorrigible juvenile offenders the opportunity to meaningfully reenter society upon their release. *See id*. at 75 ("[The Eighth Amendment] prohibit[s] States from making the judgment at the outset that those offenders never will be fit to reenter society."); *see also id*. at 74 (stating that it is "not appropriate" for sentencing courts to "deny[] the [non-incorrigible juvenile] defendant the *right* to reenter the community" in light of his or her "capacity for change and limited moral culpability" (emphasis added)).[6]

The Supreme Court indicated in *Graham*, *Miller*, and *Montgomery* that a constitutionally sufficient release mechanism must: (1) enable the decision-maker to consider the offender's "maturity and rehabilitation," *Graham*, 560 U.S. at 75, (2) limit the decision-maker's discretion to deny relief, *id*. at 77, and (3) create a "realistic" chance of obtaining release, *id*. at 82.

As for the first requirement, the Supreme Court has explained that in providing juvenile non-homicide offenders

---

[6] The Government in its submissions is not reluctant to embrace the notion that a corrigible juvenile homicide offender is entitled to a meaningful opportunity to obtain release. But the Government's "hope for some years of life outside prison walls" standard is too narrow in light of the Court's statements that the Eighth Amendment requires mitigating the pernicious long-term effects that LWOP has on juvenile offenders who still have the capacity to reform. Appellee's Br. 29.

9

who receive life sentences "some meaningful opportunity to obtain release," it sought to preserve their "incentive to become . . . responsible individual[s]," reward "good behavior and character improvement," and avoid "the perverse consequence in which the lack of maturity that led to an offender's crime is reinforced by the prison term." *Id*. at 70, 79. If a decision-maker cannot consider maturity and rehabilitation, then a release mechanism fails to accomplish these purposes.

Second, when *Graham*, *Miller*, and *Montgomery* apply, a release mechanism cannot accomplish those cases' purposes if it authorizes the denial of relief "for any reason whatsoever." *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1730 (2017) (Ginsburg, J., concurring in the judgment).[7]

Third, a release mechanism must provide juvenile offenders who fall within *Graham*, *Miller*, and *Montgomery*'s purview with a "realistic" rather than a "remote" opportunity of obtaining release. *Graham*, 560 U.S. at 82. Though the Supreme Court has never outlined a test for distinguishing a

---

[7] Perhaps the best illustration of this requirement comes from the Supreme Court's jurisprudence contrasting clemency and parole. In most cases, a governor or president may "commute a sentence at any time for any reason without reference to any standards." *Solem v. Helm*, 463 U.S. 277, 301 (1983). Because inmates cannot predict when they will be considered for relief, what factors will influence release decisions, or how likely they are to win a reprieve, clemency creates little incentive for "good behavior and character improvement." *Graham*, 560 U.S. at 70.

realistic opportunity from a remote one, several of its decisions provide useful benchmarks. On one side of the spectrum, a release mechanism that fails to result in the release of any offender "in over eight years" cannot cure the Eighth Amendment concerns associated with a life sentence. *Solem v. Helm*, 463 U.S. 277, 302 (1983). On the other side of the spectrum, the Court has acknowledged that "[a] State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole." *Montgomery*, 577 U.S. at 212.

### III.

Here, the District Court found Grant to be corrigible. In my view, for those juvenile homicide offenders who fall within this parameter,[8] the sentencing court must consider whether there is a meaningful opportunity to obtain release. If a corrigibility finding is made, any sentence imposed must contemplate a meaningful opportunity to obtain release. Our colleagues' decision forgoes the teaching of *Graham*, *Miller*, and *Montgomery*. It essentially abdicates their duty to consider whether, after a corrigibility finding has been made, a juvenile homicide offender has a meaningful opportunity for release.

In this case, evidence presented at Grant's resentencing hearing shows that he has a meaningful opportunity to obtain release from prison. That is all the Constitution requires.

I thus concur in the judgment as to Section III.A of the majority opinion and in toto as to Section III.B.

---

[8] This will be a vast majority of juvenile offenders. *See Montgomery*, 577 U.S. at 209.

11

AMBRO, *Circuit Judge*, concurring in part and dissenting in part, with whom MCKEE, *Circuit Judge*, joins.

RESTREPO, *Circuit Judge*, joins except with respect to Part I.

I.

I join in the unanimous judgment of the Court with respect to the Eighth Amendment issue in this case, but I do not join the entirety of my colleagues' reasoning. Like Judge Greenaway, and unlike the majority, I believe that *Miller* and *Montgomery*, on their face, were best read to guarantee a meaningful opportunity for release for juvenile offenders who, like Grant, were found to be capable of reform (*i.e.*, are not incorrigible). *Compare* Concurring Op. at 5 *with* Maj. Op. at 12–14. The problem is that unlike Judge Greenaway, I believe that *Jones* effectively overruled those portions of *Miller* and *Montgomery*, and therefore the majority's reasoning is more aligned with the current state of the law. *Compare* Maj. Op. at 10, *with* Concurring Op. at 1; *see also Jones v. Mississippi*, 141 S. Ct. 1307, 1315 (2021) (holding that "permanent incorrigibility is not an eligibility criterion" for sentences of life without parole); *id.* at 1328 (Thomas, J., concurring) (observing that "though the Court purports to leave *Montgomery*'s holding intact, it recognizes that *Montgomery*'s analysis is untenable and not to be repeated"); *id.* at 1328 (Sotomayor, J., dissenting) (observing that the majority opinion "guts *Miller* . . . and *Montgomery*"). Still, as my colleagues have written well and exhaustively on the nuances of the Eighth Amendment issue in this case and my slight difference in reasoning will not affect the ultimate judgment, I do not grapple with this issue any further.

II.

Instead, I write separately primarily to express my disagreement with Section III.B of the majority opinion, which disposes of Grant's sentencing package doctrine argument on plain error review. Because preservation could hardly be clearer here, I would have reached and considered the substantial arguments that the majority avoids.

The sentencing package doctrine makes formal a "common sense" proposition: When one or more interdependent counts of a multicount conviction are vacated, the judge should take a fresh look at what remains at resentencing. *United States v. Davis*, 112 F.3d 118, 122 (3d Cir. 1997) (quoting *United States v. Pimienta-Redondo,* 874 F.2d 9, 14 (1st Cir. 1989)); *see also United States v. Ciavarella*, 716 F.3d 705, 734 (3d Cir. 2013) ("District courts should resentence *de novo* when an interdependent count of an aggregate sentence is vacated."). This logic applies both when a conviction is vacated on appeal and when a conviction is vacated by a district court on collateral review. *See United States v. Miller*, 594 F.3d 172, 180 (3d Cir. 2010); *Davis*, 112 F.3d at 122. The question Grant places before us is a straightforward clarification: Does this doctrine apply to vacated sentences as well as vacated convictions?

*1. Grant Sufficiently Preserved his Sentencing Package Doctrine Argument.*

Grant concedes that his counsel did not explicitly raise in so many words the sentencing package doctrine argument before the District Court. Appellant's Reply Br. at 22. The majority seizes on this concession to conclude that the

2

argument was unpreserved. Maj. Op. at 22–23. But in doing so, it holds counsel to too high a standard. A party preserves an argument by raising it with "sufficient specificity to alert the district court." *Brennan v. Norton*, 350 F.3d 399, 418 (3d Cir. 2003) (internal quotation marks and citation omitted). It need only be made in substance; magic words are not needed. *See United States v. Miller*, 833 F.3d 274, 283–84 (3d Cir. 2016). Counsel for Grant clearly urged the District Court to consider his existing sentence—life imprisonment on two RICO counts, forty years on three drug charges, and five years on a gun charge—as one cohesive package.

At resentencing Grant's attorney told the District Court that Grant's multiple sentences were "all part and parcel of one sentence," explaining that he did not "think anybody looked upon this as somehow a breakdown of you got 40 on this, you got 40 on that and five on that. This was a life sentence." App. at 40. He repeated that same comment three more times shortly afterward. *Id.* at 42–44. And he later made the more specific argument that "it should be clear that really it is a whole new sentencing. Everything was part and parcel of imposing a sentence that the Court thought was the correct sentence." *Id.* at 85. While Grant's counsel did not use the term "sentencing packaging doctrine," there is no question that he alerted the Court to its substance: when part of the whole falls away, reassess and resentence what is left. And there is no question the Court understood that argument as being presented, recognizing "[a]n argument has been made here that this is an entirely new sentence." *Id.* at 151. Thus it "should look at this as one cohesive sentence of life and treat it that way in determining what is an appropriate total sentence." *Id.* at 42. This is enough to preserve the point, and we should have

3

considered it anew without the constraints of plain-error review.

> 2. *The Sentencing Package Doctrine Should Apply to Vacated Sentences.*

We have not yet addressed the application of the sentencing package doctrine to vacated sentences in a precedential opinion.[1] In his concurring and dissenting opinion to the initial panel decision in this case, Judge Cowen considered this question in depth and concluded that the sentencing packaging doctrine should apply to vacated sentences. *United States v. Grant*, 887 F.3d 131, 155–160 (3d

---

[1] I note that panels of our Court have applied the sentencing package doctrine to vacated sentences in not-precedential opinions. *See United States v. Fumo*, 513 F. App'x 215, 218 (3d Cir. 2013) ("The District Court also appropriately turned to the well-established 'sentencing package' doctrine to support its approach to the restitution amounts on remand."); *United States v. Brown*, 385 F. App'x 147, 148 (3d Cir. 2010) (citing *Davis* to justify a District Court's decision to increase the sentence on one count on resentencing after a sentence on another count was challenged on appeal). And within our Circuit Chief Judge Hornak of the Western District of Pennsylvania has twice followed suit. *See United States v. Green*, No. 2:04-cr-00233, 2020 WL 4034834, at *7 (W.D. Pa. July 17, 2020) (applying the doctrine to a vacated sentence and citing *Fumo* and *Brown* for support); *United States v. Black*, No. 2:11-cr-00045-4, 2019 WL 211086, at *9 (W.D. Pa. Jan. 16, 2019) (same).

Cir. 2018) (Cowen, J., concurring in part and dissenting in part), *vacated*, 905 F.3d 285 (3d Cir. 2018) (mem.).  In my view, Judge Cowen got the law right, and I will not rehash all of his well-reasoned arguments.  Instead, I write briefly to explain why this application of the sentencing package doctrine is both important and proper.

The strongest argument is the simplest one: I cannot think of any convincing reason to distinguish between vacated convictions and vacated sentences in this context.  The sentencing package doctrine reflects that "when a defendant is found guilty on a multicount indictment, there is a strong likelihood that the district court will craft a disposition in which the sentences on the various counts form part of an overall plan."  *Davis*, 112 F.3d at 122 (citation omitted).  Therefore, when multiple sentences are interdependent (one ties in with the others) and one piece of the sentencing plan is disturbed, "common sense dictates that the judge should be free to review the efficacy of what remains in light of the original plan . . . in order to ensure that the punishment still fits both crime and criminal."  *Id.*  The Reader's Digest version: A district court's sentence on count B may be set with an eye toward the sentence set on count A, with an overall goal of achieving some aggregate result.  Thus, if the conviction for count A is vacated, the remaining sentence for count B may not be what the court would have wanted if only count B was in dispute.  To this end, it makes little difference whether the conviction for count A is vacated or only its sentence.  Either way, the assumption on which the court relied to craft its sentence on count B no longer holds.

This concern is particularly pronounced when one of the counts carries a life sentence without the possibility of parole.

5

In that case, a judge can set the sentence on the other counts knowing that the stakes for the defendant are essentially zero: He will die in jail on count A no matter what the judge does with count B. The judge might therefore choose to give only a trivial sentence on count B, knowing that it doesn't matter, or instead give an inordinately high sentence on count B, using it as a costless outlet to send a message and promote deterrence. State supreme courts across the country have been quick to recognize this reality. *See People v. Turner*, 936 N.W.2d 827, 827 (Mich. 2020) (mem.) (holding that "a concurrent sentence for a lesser offense is invalid if there is reason to believe that it was based on a legal misconception that the defendant was required to serve a mandatory sentence of life without parole on the greater offense"); *Commonwealth v. Costa*, 33 N.E.3d 412, 417 (Mass. 2015) (holding that the decisions that led to vacating a juvenile offender's life sentence "transformed a choice [to impose consecutive versus concurrent sentences] that could be regarded as somewhat symbolic into one of some consequence" (internal quotation marks omitted)); *Bear Cloud v. State*, 334 P.3d 132, 143 (Wyo. 2014) (concluding that, "[o]n remand, the district court should weigh the entire sentencing package" of a juvenile, rather than simply the one count carrying a life sentence); *Sen v. State*, 301 P.3d 106, 127 (Wyo. 2013) (holding that "because Sen's sentence of life without the possibility of parole may have impacted the sentencing decisions with respect to [other counts], . . . the appropriate course is to vacate those sentences and remand for resentencing on all counts").

This conclusion is not revolutionary. In fact, we have already affirmed *de novo* resentencing when only a sentence was vacated. *See, e.g.*, *United States v. Guevremont*, 829 F.2d 423, 428 (3d Cir. 1987). While the majority notes that this case

6

was decided prior to the creation of our formal sentencing package doctrine, Maj. Op. at 23 n.4, *Guevremont* is at least compelling authority, and we should affirm that its reasoning still applies. And while it is true that recent decisions generally describe the sentencing package doctrine as applying when a "*conviction* has been vacated, as opposed to just a sentence," that language "is best viewed as *descriptive* rather than *prescriptive*." *United States v. Catrell*, 774 F.3d 666, 670 (10th Cir. 2014) (emphases in original). We should join the Tenth Circuit—the only one of our sister circuits to consider this issue squarely—and hold that the sentencing package doctrine applies to vacated sentences. *Id.*

> 3. *The Sentencing Package Doctrine Entitles Grant to a* De Novo *Resentencing, But It Is Unclear Whether He Was Provided That Opportunity.*

Grant's case demonstrates the need for the sentencing package doctrine to apply to vacated sentences. As illustrated in the below table, the record shows interdependence among different parts of Grant's overall sentence, both in the initial 1992 sentence by Judge Ackerman and the 2016 resentencing by Judge Linares.

**Table Comparing Grant's Sentence in 1992 with his Revised Sentence in 2016**

| Count(s) | Imprisonment | | Supervised Release | |
|---|---|---|---|---|
| | 1992 | 2016 | 1992 | 2016 |
| I and II RICO (including murder and attempted murder predicates) | Life | 60 years | 5 years on all counts to run concurrently | 5 years, concurrent with other counts |
| IV Conspiracy to possess with intent to distribute cocaine | 40 years, concurrent with life sentence | | | Life |
| V and VI Possession with intent to distribute cocaine | | 40 years, concurrent with 60-year sentence | | |
| XI Gun possession | 5 years, consecutive to other counts | 5 years, consecutive to other counts | | 5 years, concurrent with other counts |

*Shaded cells indicate a change in Grant's sentence between the 1992 and 2016 sentencings.*

Nearly three decades ago, Judge Ackerman sentenced Grant to life imprisonment for the racketeering counts under the then-mandatory Sentencing Guidelines. With that life sentence in place, it is quite plausible that Judge Ackerman viewed his sentence on the drug counts as simply symbolic. In particular, he preceded his sentence by stating that there was a "plague in this land . . . in the form of drugs." App. 450. And he went further, emphasizing that he had a "responsibility . . . to send a message to those who violate the laws of this land in such a violent and extensive manner, involving the pollution of our community, the destruction of our children, and, in this case, the murder of an individual." App. 451. In addition to a

five-year mandatory minimum sentence on the gun count, he ultimately sentenced Grant to forty years on the drug counts (well above the mandatory minimum) to run concurrently with the life sentence.

Decades later, after the Supreme Court prohibited life-without-parole sentences for non-incorrigible juveniles, Grant became eligible to have his life sentence adjusted. For all the reasons stated above, he deserved to have a fresh sentencing. But it is unclear whether he was provided that opportunity. The Government argues that Judge Linares actually provided Grant a full resentencing, pointing out that Judge Linares modified a component of the sentence on the drug counts—increasing the term of supervised release for Counts IV–VI from five years to life.[2] Gov't's Second Supp. Br. 1–2.

At the same time, however, the language that Judge Linares used during the resentencing suggested that he was not really considering anew the appropriate sentence on Counts IV–VI and XI, but rather deferring to Judge Ackerman's choices (at least with respect to the terms of imprisonment).[3]

---

[2] Judge Linares also increased Grant's term of imprisonment for the drug conspiracy charge (Count IV) from 40 to 60 years. While this could have been an intentional change if Judge Linares viewed himself as engaging in *de novo* resentencing, the majority concludes that this was simply an "inadvertent sentencing error." Maj. Op. at 24 n.5. The majority does not address whether it also views the increased term of supervised release on Counts IV–VI as another inadvertent error.

[3] The majority has similarly concluded that "[t]he Court decided to limit resentencing to Counts I and II." Maj. Op. at 24 n.5.

9

To do otherwise, he believed, would "be almost unfair to the system and unfair to Judge Ackerman all of these years later." App. at 152. This would have the effect of setting a floor of 45 years on Grant's sentence and could easily have affected the ultimate 65-year sentence. As the Government pointed out at resentencing, "45 years . . . , other than the fact of the gun count, doesn't really account for the murders . . . ." App. at 128. That is, if Judge Linares wanted to impose an incremental punishment for the murder and attempted murder (included in RICO Counts I and II), he would need to go above the floor of 45 years for the drug and gun counts. And he did—sentencing Grant to 60 years on the RICO counts. This suggests that an isolated piece of Judge Ackerman's old sentencing plan (imprisonment on Counts IV–VI and XI) may have been the tail that wagged the dog at Grant's resentencing rather than the sentencing plan being refashioned from scratch.

\* \* \* \* \*

Everyone agrees that Grant's crimes are gravely serious, and I do not suggest that a lower sentence is necessarily warranted. But, at a minimum, the sentencing package doctrine should apply here, Grant properly invoked it, and he is entitled to a full resentencing. Because the record is unclear whether he actually received the full resentencing opportunity he is due, I would have remanded more broadly to the District Court either to (1) engage in a truly *de novo* resentencing, or (2) explain why its sentence was in fact the product of *de novo* consideration. *See Bear Cloud*, 334 P.3d at 143 n.11 (concluding that a trial court's "cursory consideration" of other counts in the sentencing package in its resentencing was insufficient). For these reasons, I dissent from Section III.B of the majority's opinion.

10