*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
May 9, 2024

Plaintiff-Appellant,

v

No. 361540
Kent Circuit Court
LC No. 00-005206-FC

DAMON ANDREW JACKSON,

Defendant-Appellee.

Before: M. J. KELLY, P.J., and JANSEN and MURRAY, JJ.

MURRAY, J. (*concurring*).

As Justice Antonin Scalia was known to say, if a judge objectively applies the law, there will inevitably be decisions containing results that do not square with one's personal views.[1] For two interrelated reasons, this is one of those decisions.[2] First, in what has resulted in effectively immunizing individuals under 19 who commit murder from receiving a sentence of life without parole, Michigan caselaw governing the sentencing of juveniles convicted of murder has gone beyond what is required by statute or the constitution. Second, as a result of that caselaw, individuals like Damon Jackson—who intentionally physically and sexually abused his one-month-old son David resulting in his death—can receive a term of years sentence and feel confident it will not be overturned on appeal. And although I am cognizant that an opinion concurring with an unpublished opinion will receive little (if any) attention in the annals of Michigan law, and that *People v Taylor*, 510 Mich 112; 987 NW2d 132 (2022), has put tight

---

[1] <https://youtu.be/Tme4DEwGL3U\> (accessed April 26, 2024).

[2] What compels my vote to affirm is a faithful adherence to the abuse of discretion standard, a standard that is very deferential to the trial court's decision. And here, in rendering its decision, the trial court made findings of fact under the appropriate factors. If we actually apply these meaningful standards of review, we must affirm this decision even if we would have concluded differently had we sat as the trial judge. See *Alken-Ziegler, Inc v Waterbury Headers Corp*, 461 Mich 219, 227; 600 NW2d 638 (1999) ("An abuse of discretion involves far more than a difference in judicial opinion.").

clamps on trial courts resentencing defendants under 19 to LWOP, it is still worth explaining what current Michigan caselaw is, and how it has essentially foreclosed the statutory penalty of LWOP for those who commit murder when 18 or younger—even in these horrible circumstances.

As will be explained below, in rendering its decision, the trial court placed significant weight on *People v Bennett*, 335 Mich App 409; 966 NW2d 768 (2021), both for its general statements on juvenile homicide sentencing, and its discussion diminishing the factor regarding the crime and its attendant circumstances. Though the trial court was not wrong to do so, as it is a published decision, *Bennett* (and some of the decisions it relied upon) contained several misstatements of controlling law.

## I. THE EXPANSION OF *MILLER* DICTA INTO MICHIGAN LAW

The Court in *Miller v Alabama*, 567 US 460, 479; 132 S Ct 2455; 183 L Ed 2d 407 (2012), was very clear that its only holding was "that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." Mandatory LWOP sentences were invalid, the Court concluded, because they prevented trial courts from considering several important factors:

> To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it. [*Id*. at 477-478 (citations omitted).]

In *Jones v Mississippi*, 593 US 98, 108-109; 141 S Ct 1307; 209 L Ed 2d 390 (2021), the Court reiterated *Miller*'s limited holding:

> Stated otherwise, the *Miller* Court mandated "only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing" a life-without-parole sentence. In that process, the sentencer will consider the murderer's "diminished culpability and heightened capacity for change." That sentencing procedure ensures that the sentencer affords individualized "consideration" to, among other things, the defendant's "chronological age and its hallmark features." [Citations omitted.]

There can be no doubt that *Miller*'s holding was only that *mandatory* statutory life sentences for those under 18 were invalid because they precluded individualized sentencing that considered the attributes of youth, and that sentencing courts must engage in a review of certain

mitigating factors when determining if a life without parole sentence was warranted.[3]  As the en banc United States Court of Appeals for the Third Circuit recognized, "*Miller* did not 'impose a categorical bar against life without parole for murderers under 18.'  Instead, *Miller* cited *Roper* and *Graham*[4]for the proposition that '[y]outh matters in sentencing,' which requires 'that a sentencer [ ] have discretion to consider youth before imposing a life-without-parole sentence.' " *United States v Grant*, 9 F4th 186, 196 (CA 3, 2021) (citations omitted; alterations in original).

As noted by *Grant*, there is a universal recognition that neither *Miller* nor *Montgomery v Louisiana*, 577 US 190; 136 S Ct 718; 193 L Ed 2d 599 (2016), categorically barred LWOP sentences.  *Grant*, 9 F4th at 196-197.  Likewise, neither decision imposed any requirement that a court only sentence a person under 18 (or 19 in Michigan) after a finding of "incorrigibility."  See *Jones*, 593 US at 105-106; *People v Skinner*, 502 Mich 89, 121; 917 NW2d 292 (2018).  In fact, *no* particular finding is required under MCL 769.25, *Taylor*, 510 Mich 112, or under the federal constitution, *Jones*, 593 US at 106, when sentencing someone to LWOP.[5]  What these decisions do require is taking into account the attributes of youth, as well as the crime and its attendant circumstances, when fashioning an individualized sentence.

Despite *Miller*'s limited holding, what this Court in *People v Hyatt*, 316 Mich App 368; 891 NW2d 549 (2016), rev'd in part on other grounds by *Skinner*, 502 Mich 89, *People v Garay*, 320 Mich App 29; 903 NW2d 883 (2017), rev'd in part on other grounds by 506 Mich 936 (2020), and *Bennett*, 335 Mich App at 426, emphasized from *Miller* was *Miller*'s dicta that LWOP sentences would likely be imposed (after application of the mitigating factors) only on those "uncommon" or "rare" juveniles who exhibit "irreparable corruption."[6]  By focusing on that and similar terminology, rather than on the application of the *Miller* factors that may or may not result in a LWOP sentence, the Court essentially directed trial courts to the improper understanding that LWOP sentences should only be imposed when a court finds the defendant to be irreparably corrupt.  See *Bennett*, 335 Mich App at 420 ("While the *Miller* factors remain highly relevant, a judge resentencing an offender who has served many years in prison has the benefit of actual data regarding whether the offender's life in prison is truly consistent with 'irreparable corruption,' the only ground *Miller* specifically identified for imposing a life-without-parole sentence."), and 434

---

[3] We recognized the limited holding of *Miller* more than a decade ago in *People v Eliason*, 300 Mich App 293, 309; 833 NW2d 357 (2013), remanded by *People v Carp*, 496 Mich 440; 852 NW2d 801 (2014), acknowledging that the "limited holding in *Miller* was that a juvenile cannot be *automatically* subjected to a punishment of life imprisonment without the possibility of parole."

[4] *Roper v Simmons*, 543 US 551; 125 S Ct 1183; 161 L Ed 2d 1 (2005), and *Graham v Florida*, 560 US 48; 130 S Ct 2011; 176 L Ed 2d 825 (2010).

[5] *Taylor*'s conclusion as to the statute seems at odds with MCL 769.25(7), which requires the trial court to "specify on the record the aggravating and mitigating circumstances considered by the court and the court's reasons supporting the sentence imposed."

[6] Numerous courts have recognized that the statement in *Miller* that it will be the rare occasion when, after applying the factors, a person will still be subject to LWOP, was dicta.  See *State ex rel Mitchell v Cooper*, 256 Ariz 1, 14; 535 P3d 3 (2023) (recognizing this statement from *Miller* as dicta), and *Phon v Commonwealth*, 545 SW3d 284, 293 (Ky, 2018) (same).

("Indeed, the prosecutor introduced *no* evidence supporting that Bennett is 'irreparably corrupt.' 'Just as courts are not allowed to impose disproportionate sentences, courts are not allowed to sentence juveniles who are not irreparably corrupt to life without parole.' The resentencing court clearly erred by ignoring this constitutional mandate.") (citations omitted). Neither *Miller* nor *Montgomery* held as much.

In fact, as noted above, both the United States and Michigan Supreme Courts have held that there is *no* requirement that a court make a specific finding about a defendant being "irreparably corrupt," *Skinner*, 502 Mich at 122 (holding "that *Miller* does not require trial courts to make a finding of fact regarding a child's incorrigibility"); *Jones*, 593 US at 106 ("*Miller* did not impose a formal factfinding requirement" and . . . "a finding of fact regarding a child's incorrigibility ... is not required.") (quotation marks and citation omitted), and 108 ("[I]t comes as no surprise that *Miller* declined to characterize permanent incorrigibility as such an eligibility criterion."). The *Jones* Court could not have been clearer on this point:

> In advancing that argument, Jones relies on language in *Montgomery* that described *Miller* as permitting life-without-parole sentences only for "those whose crimes reflect permanent incorrigibility," rather than "transient immaturity." In other words, because the *Montgomery* Court deemed *Miller* to be a substantive holding, and because *Montgomery* said that life without parole would be reserved for the permanently incorrigible, Jones argues that the *Montgomery* Court must have envisioned a separate factual finding of permanent incorrigibility, not just a discretionary sentencing procedure where youth would be considered.

> That is an incorrect interpretation of *Miller* and *Montgomery*. We know as much because *Montgomery* said as much. To reiterate, the *Montgomery* Court explicitly stated that "a finding of fact regarding a child's incorrigibility . . . is not required." [*Id*. at 110 (citations omitted).]

This proposition is consistent with what the Michigan and United States Supreme Court have also stated: that a trial court need not articulate on the record *any* findings under the *Miller* factors. See *People v Boykin*, 510 Mich 171, 191-192; 987 NW2d 58 (2022) ("*Jones* held that an on-the-record sentencing explanation of the *Miller* factors is not necessary in cases where a life-without-parole sentence is imposed . . . . We also find no requirement for an on-the-record articulation of how youth or the *Miller* factors affected a sentence in our caselaw"); *Jones*, 593 US at 116-117 ("Because the Constitution does not require an on-the-record explanation of mitigating circumstances by the sentencer in *death penalty cases*, it would be incongruous to require an on-the-record explanation of the mitigating circumstance of youth by the sentence in *life-without-parole cases*.").

Of course, the *Bennett* Court did not have *Jones*, *Boykin*, or *Taylor* available to it, so that may explain why it erroneously emphasized the need for a finding by the trial court that the defendant was irreparably corrupt before it could impose LWOP.[7] To the extent that *Bennett*

---

[7] Though *Hyatt* had already recognized that neither *Miller* nor MCL 769.25 required a finding of any particular fact before imposing LWOP. *Hyatt*, 316 Mich App at 399.

stands for the proposition that a court must find the defendant to be irreparably corrupt (or something similar), it is inconsistent with these decisions. For, as *Jones* makes clear, it is the application of the *Miller* factors that will result in fewer LWOP sentences, not any overall legal precept against such sentences. See *Jones*, 593 US at 119 ("*Miller*'s discretionary sentencing procedure has resulted in numerous sentences less than life without parole for defendants who otherwise would have received mandatory life-without-parole sentences."); *Grant*, 9 F4th at 197 ("The Court's precedents only 'require a *discretionary sentencing procedure*,' which itself 'has indeed helped make life-without-parole sentences for offenders under 18 relatively rare.' "), and 193 ("The *Miller* bar on mandatory LWOP sentencing regimes is a prophylactic that entitles a juvenile homicide offender to a certain sentencing process, but not a particular sentencing outcome—a result that follows from the Supreme Court's decision in *Jones*[.].").

All that being said, in light of the standards imposed on proceedings under MCL 769.25 by *Taylor*, our prior cases may no longer be overly relevant. Specifically, the *Taylor* Court held that a rebuttable presumption exists under the statute *against* sentencing those under 19 to LWOP, and that the prosecution, as the moving party, bears the burden to overcome this presumption by clear and convincing evidence. *Taylor*, 510 Mich at 129. In addition, the Supreme Court reiterated that the *Miller* factors are not to be used as aggravators; if a particular *Miller* factor does not militate against LWOP, that factor will be considered neutral. *Id*. at 139 n 25. Even if the prosecutor rebuts the presumption, the trial court is still not obligated to impose LWOP. See *id*. Under *Taylor*, 510 Mich at 139 n 25, all *Miller* factors are mitigating or neutral; they are not aggravating.[8]

Whatever the merits of *Taylor*, it is binding. And, coupled with the caselaw from this Court that strayed from the actual holding of *Miller* and its progeny, we are left with a system whereby the circumstances of the murder can *at best* be considered "neutral" (despite MCL 769.25 allowing the court to consider aggravating circumstances as well as mitigating ones), simply because a defendant was under 19 when he committed the murder. This holds true even in a case like this, where the crime committed was, all agree, unfathomable.

## II. DEFENDANT'S CRIME

The trial court[9] gave little weight in its overall analysis of "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and

---

[8] Though of course the legislature indicated that a court should consider both mitigating and aggravating circumstances. MCL 769.25(7).

[9] The trial court held this second *Miller* hearing after finding that defense counsel was ineffective during the first *Miller* hearing. But, as the prosecution argues, the trial court seems to have engaged in much second-guessing of counsel's decisions, which would be inconsistent with the appropriate deference given to counsel's strategic decisions. As the majority also notes, the court's later off-the-cuff statements about how it ruled do not fall within the exception to the application of the law-of-the-case doctrine. Nevertheless, the trial court's ultimate conclusion is hard to swallow, particularly in light of Judge Johnston's statement at the end of the first *Miller* hearing that "[t]his

peer pressures may have affected him." *Taylor*, 510 Mich at 126.  In addressing this third *Miller* factor, the trial court acknowledged the abhorrent circumstances of the homicide, but noted that this Court "counseled against giving too much weight to the offense conduct."  See *Bennett*, 335 Mich App at 426.  The trial court also indicated that the incompetencies of youth did not affect defendant's interaction with authorities or his ability to assist in his defense, and that this factor weighed in favor of LWOP, but again the court gave this factor little weight.

The trial court limited the significance of David's horrific murder in light of *Bennett*'s statement that "[n]early every situation in which a sentencing court is asked to weigh in on the appropriateness of a life-without-parole sentence will involve heinous and oftentimes abhorrent details.  After all, the sentence can only be imposed for the worst homicide offenses.  However, the fact that a vile offense occurred is not enough, by itself, to warrant imposition of a life-without-parole sentence." *Bennett*, 335 Mich App at 426, quoting *Hyatt*, 316 Mich App at 420-421.

That premise may be true, i.e., every case involving a LWOP sentence results from a homicide, all homicides are bad, and that factor *alone* cannot carry the day in imposing a LWOP sentence.  But that premise also cannot then be used to *diminish* the nature and circumstances of the crime, particularly in a case like this.  If that were not the case, *Miller* would not have listed the circumstances of the crime as a factor to consider, and would have simply precluded all LWOP sentences for those under 18, as it did in other decisions; but it clearly did not.  See *Miller*, 567 US at 483 ("Our decision does not categorically bar a penalty for a class of offenders or type of crime—as, for example, we did in *Roper* or *Graham*.  Instead, it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty.").  See also *State v Soto-Fong*, 250 Ariz 1, 7; 474 P3d 34 (2020).

In other words, it is true that all homicides are horrible, but as *Miller* and its progeny make clear, one of the five factors under *Miller* to consider in providing an individualized sentence is the nature of the crime and the defendant's involvement in it, for there *are* differences in crimes and the circumstances surrounding them.  As *Miller* itself acknowledged, there is a difference in kind between a young defendant who was pressured by friends or family into doing something that indirectly led to a murder, and a defendant who deliberately kills someone without any pressure to do so:

> Such mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it.  Under these schemes, every juvenile will receive the same sentence as every other—the 17–year–old and the 14–year–old, the shooter and the accomplice, the child from a stable household and the child from a chaotic and abusive one.  And still worse, each juvenile (including these two 14–year–olds) will receive the same sentence as the vast majority of adults committing similar homicide offenses—but

---

case has been extremely well prepared by very able counsel.  The briefing has been excellent. The factual presentation has been top-notch.  The arguments have been exceptionally high caliber."

really, as *Graham* noted, a *greater* sentence than those adults will serve. [*Miller*, 567 US at 476-477].

*Bennett*'s attempt to diminish this factor on the basis that all homicides are equally bad requires ignoring *Miller*'s commands. *Id*. at 477 (mandatory sentences "neglect[] the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him"). [10]

In light of the expansive language used in *Bennett*, the trial court found that the circumstances of the crime only "slightly favored" a LWOP sentence. This conclusion was made despite the following undisputed facts:

1. On the day of the main abuse, defendant did not want to take David—instead, he wanted to get high smoking marijuana—because he had previously shaken David, held his hand over his mouth to try to keep him quiet, and "hated his son."

2. At the time, defendant was upset at David's mother, as she did not name David after him, and she had refused to have sex with defendant.

3. After agreeing to watch David, David starting crying, so defendant held David tight, so much so that he could not breathe, and forced David to hold his breath.

4. Defendant took David into the bathroom so no one would hear him, and once there, forced David to engage in oral sex. Defendant's explanation for this decision:

I remember thinking, fine, Damon, if you're not going to call Holly, why not masturbate, and then I thought, "You have David." Now, anal sex, I've always thought it was disgusting and I wouldn't even do it with a girl. But I'm real big on oral sex, and I was always trying to get Holly to do it. She wouldn't. I remember thinking, or hearing, "Why not have David do it?"

5. Then, while calling David "lots of mean things," defendant forced David's mouth open, held his head from behind, forced his penis into David's mouth, and ejaculated.

6. Defendant then dropped David on the floor, where David coughed and tried to breathe. At the same time, he asked David whether he wished his mother had named him Damon.

7. While David was still crying and trying to breathe, defendant carried David by his throat into the kitchen. There, David began to start and stop breathing, and then went limp. At trial defendant explained his next horrific steps:

---

[10] Of course now, under *Taylor*, even if the circumstances of the crime show intentional misconduct without any evidence of peer pressure, the factor is to be given neutral weight.

David started to act up with his breathing. He would breath [sic] and stop for a few seconds. Finally, he stopped. I hit him and he breathed. Then I went on for some - - this went on for some time. Finally he went limp, I thought he was dead. He didn't breath [sic] for some quite some times [sic], ten seconds. I panicked. I would hit him but no response. I pinched his leg, nothing. I finally thought to pinch his penis. I know that it would hurt and I'd get a reaction. Well, he didn't react so then, I don't know why, but I thought of how much pain it had been to me when my cousin screwed me up the butt. It hurt like held [sic]. So, I grabbed an ink pen. I [sic] didn't do anything. Then I remember the plunger I seen in the bathroom. I went and grabbed it, put some grease on it and inserted it anally. It got a good response so I took it out, wiped it off and put it back.

8. When David gained consciousness, defendant started to hit David out of anger.

These unconscionable acts were intentional, and not the result of "youthful indiscretion" or "peer pressure." Our prior opinion forecloses that conclusion:

We believe that given the seriousness of the charges, this appreciation of the criminality of his actions also implies an understanding that society would consider this conduct immoral or wrongful. This conclusion is supported by defendant's admission that he could control his conduct when in front of other people. "I can control this in front of people," defendant acknowledged. "I mean, like I said, I'm not a stupid person. I know what you can and cannot do." We believe this clearly indicates that defendant understood the pervasive societal prohibition against such conduct.

Defendant's candid acknowledgment that he could and did control his behavior in public also shows that he possessed the substantial capacity to conform his conduct to the requirements of the law. As the trial court noted, no evidence was presented showing that defendant ever harmed his son in the presence of others. We believe his ability to restrain himself until the threat of immediate detection by others had passed evidences a capacity to conform well beyond the ephemeral. In fact, defendant's declaration that he could control himself in front of others evidences a level of capacity to refrain that rises to and beyond being substantial. Defendant also admitted that he took his son to the bathroom on the night when the charged acts occurred precisely because he did not want others in the house to hear what was going on. This kind of purposeful behavior to avoid discovery only further confirms the conclusion that defendant had an appreciable ability to stop himself when he chose to do so. [*People v Jackson*, 245 Mich App 17, 25; 627 NW2d 11 (2001).]

As the original trial judge, Judge Donald Johnston, defendant's counsel for both trials and the first *Miller* hearing, and the current trial court all acknowledged—this was one of, if not the worst, crime each had seen over decades of experience. Indeed, Judge Johnston, a Kent Circuit judge for more than two decades, opined that it was about the worst of the worst. Yet, under the precedent established by *Hyatt*, *Garay* and *Bennett*, the trial court felt free to reduce the

significance of these intentional acts. Why? According to the trial court, because *Bennett* counseled that all homicides are bad, so the seriousness of the crime does not add much to the mitigating factors to be considered. And, to a large extent, the court was correct about what *Bennett* says.

But in the end these decisions come down not to simple fact-finding, but a moral judgment as to whether the mitigating and aggravating factors entitle a defendant to a lesser sentence. See *Skinner*, 502 Mich at 116 n 11 (a "trial court's decision to impose life without parole after considering the mitigating and aggravating circumstances is not a factual finding, but a moral judgment"); *Kansas v Carr*, 577 US 108, 119; 136 S Ct 633; 193 L Ed 2d 535 (2016) ("Whether mitigation exists . . . is largely a judgment call (or perhaps a value call); what one juror might consider mitigating another might not. And of course the ultimate question whether mitigating circumstances outweigh aggravating circumstances is mostly a question of mercy—the quality of which, as we know, is not strained."). For the reasons explained by Judge Johnston when resentencing defendant to LWOP after the first *Miller* hearing, the correct moral judgment was to sentence defendant to life without parole. But, as I said at the start of the opinion, the abuse of discretion standard precludes substituting my judgment for that expressed by the trial court when that decision falls within the range of principled outcomes. Under our current state of the law, it does.

/s/ Christopher M. Murray